2016-2394, -2395, 2017-1105, -1106, -1107, -1108

# United States Court of Appeals for the Federal Circuit

CAPELLA PHOTONICS, INC.,

*Appellants*,

– v. –

CISCO SYSTEMS, INC., CIENA CORPORATION, CORIANT OPERATIONS, INC., CORIANT (USA) INC., FUJITSU NETWORK COMMUNICATIONS, INC., LUMENTUM HOLDINGS, INC., LUMENTUM INC., LUMENTUM OPERATIONS, LLC,

*Appellees*

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2014-01166, IPR2014-01276, IPR2015-00726, IPR2015-00727, IPR2015-00731, IPR2015-00739, IPR2015-00816, IPR2015-00894, IPR2015-01958, IPR2015-01961, IPR2015-01969, and IPR2015-01971.

## APPELLEES' JOINT RESPONSE BRIEF

Sarah J. Guske
Email: sarah.guske@bakerbotts.com
Baker Botts LLP
101 California Street, Suite 3070
San Francisco, CA 94111
Direct: 415-291-6205

Wayne O. Stacy
Email:wayne.stacy@bakerbotts.com
Baker Botts, LLP
2001 Ross Avenue
Dallas, TX 75201
Direct: 214-953-6678

*Attorneys for Cisco Systems, Inc.*

Dated: May 26, 2017

Mark C. Scarsi
Email: mscarsi@milbank.com
Milbank, Tweed, Hadley & McCloy LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Direct: 424-386-4000

*Attorneys for Fujitsu Network
Communications, Inc.*

Christopher J. Gaspar
Email: cgaspar@milbank.com
Nathaniel T. Browand
Email: nbrowand@milbank.com
Milbank, Tweed, Hadley & McCloy LLP
28 Liberty Street
New York, NY 10005-1413
Direct: 212-530-5000

Matthew J. Moore
Email: matthew.moore@lw.com
Latham & Watkins LLP
555 11th Street NW
Washington, DC 20004
Direct: 202-637-2278

*Attorneys for Ciena Corporation*

Clement Naples
Email: clement.naples@lw.com
Chi Cheung
Email: chi.cheung@lw.com
Latham & Watkins LLP
885 Third Ave
New York, NY 10022
Direct:  212-906-1200

J. Pieter van Es
Email: pvanes@bannerwitcoff.com
Thomas K. Pratt
Email: tpratt@bannerwitcoff.com
Banner & Witcoff, Ltd.
Ten South Wacker Drive
Chicago, IL 60606
Direct: 312-463-5000

*Attorneys for Coriant Operations, Inc.,
and Coriant (USA) Inc.*

Michael S. Cuviello
Email: mcuviello@bannerwitcoff.com
Banner & Witcoff, Ltd.
1100 13th Street, NW, Suite 1200
Washington, DC 20005
Direct: 202-824-3307

Joel D. Sayres
Email: joel.sayres@faegrebd.com
Faegre Baker Daniels LLP
3200 Wells Fargo Center,
1700 Lincoln Street
Denver, CO 80203
Direct: 303-607-3500

*Attorneys for Lumentum Holdings Inc.,
Lumentum Inc., Lumentum Operations LLC*

Kenneth Liebman
Email: kenneth.liebman@faegrebd.com
Faegre Baker Daniels LLP
2200 Wells Fargo Center
90 S. Seventh Street
Minneapolis, MN 55402
Direct: 612-766-8800

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Capella Photonics, Inc.     **v.**     Cisco Systems, Inc. et al

Case No.    2016-2394,-2395; 2017-1105, -1106, -1107, 1108

## CERTIFICATE OF INTEREST

Counsel for the:

☐ (petitioner) ☐ (appellant) ☐ (respondent) ☒ (appellee) ☐ (amicus) ☐ (name of party)

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10 % or more of stock in the party |
|---|---|---|
| Cisco Systems, Inc. | Cisco Systems, Inc. | None |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

4.   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

Baker Botts L.L.P.: Sarah J. Guske; Wayne O. Stacy (both formerly of Cooley LLP
Wilmer Cutler Pickering Hale and Dorr L.L.P.: Matthew Leary (formerly of Cooly LLP

May 26, 2017

Date

/s/ Sarah J. Guske

Signature of counsel

Sarah J. Guske

Printed name of counsel

Please Note: All questions must be answered

cc: _____

Reset Fields

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

CAPELLA PHOTONICS, INC.,

*Appellants*,

– v. –

CISCO SYSTEMS, INC., CIENA CORPORATION, CORIANT
OPERATIONS, INC., CORIANT (USA) INC., FUJITSU NETWORK
COMMUNICATIONS, INC., LUMENTUM HOLDINGS, INC.,
LUMENTUM INC., LUMENTUM OPERATIONS, LLC,

*Appellees*

Case Nos. 2016-2394, -2395, 2017-1105, -1106, -1107, -1108

## CERTIFICATE OF INTEREST

Counsel for Appellee Ciena Corporation certifies the following:

1. Full Name of Party represented by me:

   Ciena Corporation

2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is:

   Ciena Corporation

3. Parent corporations and publicly held companies that own 10 percent or more of stock in the party:

   BlackRock, Inc.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

**Latham & Watkins LLP**: Elizabeth V. Johnson (former), Michelle P. Woodhouse, Cassius K. Sims, James R. Bender (former)

| 5/26/2017 | /s/ Matthew J. Moore |
| --- | --- |
| Date | Signature of counsel |

| Please note: All questions must be answered | Matthew J. Moore |
| --- | --- |
| | Printed name of counsel |

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Capella Photonics, Inc.     **v.**     Cisco Systems, Inc. et al

Case No. 16-2394, -2395 (Consolidated)

## CERTIFICATE OF INTEREST

Counsel for the:

☐ (petitioner) ☐ (appellant) ☐ (respondent) ☒ (appellee) ☐ (amicus) ☐ (name of party)

Coriant Operations, Inc. (formerly known as Tellabs Operations, Inc.) Coriant (USA) Inc.

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10 % or more of stock in the party |
|---|---|---|
| Coriant Operations, Inc. | Coriant Operations, Inc. | For Coriant Operations, Inc: Tellabs, Inc. For Coriant (USA) Inc.: Coriant International Group LLC. Additionally, out of an abundance of caution, appellees note that Marlin Equity Partners, through a series of intermediate, related-party transactions, is the majority owner of Coriant Operations, Inc. and Coriant (USA) Inc. |
| | Coriant (USA), Inc. | |
| | | |
| | | |
| | | |
| | | |
| | | |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

Banner & Witcoff, Ltd.: Jordan N. Bodner

May 26, 2017

**Date**

/s/ Jonathan Pieter van Es

**Signature of counsel**

Please Note: All questions must be answered

Jonathan Pieter van Es

**Printed name of counsel**

cc: See attached Certificate of Service

Reset Fields

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Capella Photonics, Inc.     **v.**     Cisco Systems, Inc. et al.

Case No.    16-2394, 2395, 17-1105, 1106

## CERTIFICATE OF INTEREST

Counsel for the:

☐ (petitioner) ☐ (appellant) ☐ (respondent) ☒ (appellee) ☐ (amicus) ☐ (name of party)

Fujitsu Network Communications, Inc.

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10 % or more of stock in the party |
|---|---|---|
| Fujitsu Network Communications, Inc. | Fujitsu Network Communications, Inc. | Fujitsu Limited |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

4.   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

Milbank, Tweed, Hadley & McCloy LLP:  Christopher Chalsen, Lawrence Kass, Suraj Balusu

| | |
|---|---|
| May 26, 2017 | /s/ Mark C. Scarsi |
| Date | Signature of counsel |

Please Note: All questions must be answered

Mark C. Scarsi

Printed name of counsel

cc:  See Certificate of Service

Reset Fields

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Capella Phtonics, Inc.                    **v.**                    Cisco Systems, Inc., et al.

Case No.    16-2394, -2395, 17-1105, -1106

## CERTIFICATE OF INTEREST

Counsel for the:

☐ (petitioner) ☐ (appellant) ☐ (respondent) ☒ (appellee)☐ (amicus)☐ (name of party)

Lumentum Holdings Inc., Lumentum Inc., and Lumentum Operations LLC

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10 % or more of stock in the party |
|---|---|---|
| Lumentum Holdings Inc. | Lumentum Holdings Inc. | See Attachment |
| Lumentum Inc. | Lumentum Inc. | Lumentum Holdings Inc. |
| Lumentum Operations LLC | Lumentum Operations LLC | Lumentum Inc. |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

4.   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

Faegre Baker Daniels LLP:  Walter C. Linder

May 26, 2017                                         /s/ Joel D. Sayres
_____            _____
Date                                                 Signature of counsel

Please Note: All questions must be answered        Joel D. Saayres
                                                   _____
                                                   Printed name of counsel

cc: _____

Reset Fields

## **ATTACHMENT**

3. Parent corporations and publicly held companies that own 10 % or more of stock in the party :

Capitol Research Global Investors and BlackRock Inc.
each own more than 10% of Lumentum Holdings Inc.

# TABLE OF CONTENTS

<u>Page</u>

TABLE OF CONTENTS.............................................................................i

TABLE OF AUTHORITIES ....................................................................iv

TABLE OF ABBREVIATIONS ............................................................ viii

STATEMENT OF RELATED CASES ....................................................ix

INTRODUCTION ....................................................................................1

STATEMENT OF THE ISSUES................................................................2

STATEMENT OF THE CASE ..................................................................3

    A.   The '368 and '678 Patents................................................................3

    B.   Bouevitch Describes a MEMS-Based Dynamic Gain Equalizer and a MEMS-Based Switching Device................................................................7

    C.   Smith, Carr, and Sparks Disclose Dynamic Gain Equalizers With Two-Axis Mirrors................................................................9

    D.   Proceedings at the Patent Trial and Appeal Board..................................11

        1.   "Providing" and "Port"....................................................12

        2.   Obviousness Findings....................................................14

        3.   Smith................................................................16

SUMMARY OF THE ARGUMENT ........................................................17

ARGUMENT ........................................................................................20

I.    The Board Properly Determined That Bouevitch Discloses "Fiber Collimators, Providing an Input Port . . . and a Plurality of Output Ports" as Recited in the Challenged Claims of the '678 Patent ......................................20

    A.   Capella's Claim Construction Argument Implicitly Depends on an Overly Narrow Construction of "Providing" That Capella Did Not

i

Raise Below and Is Unsupported by the Intrinsic and Extrinsic Evidence ................................................................21

    1.   Capella's Unspecified Claim Construction Requires a Narrow Construction of the Term "Providing" ..............................21

    2.   Capella Never Offered a Construction of the Term "Providing" Below So Its New Argument Is Waived ..........................................22

    3.   The '678 Patent Claims, Specification, and Extrinsic Evidence Support Construing the "Providing" According to Its Plain and Ordinary Meaning...........................................................................24

B.   Substantial Evidence Supports the Board's Determination that Bouevitch Discloses "Fiber Collimators, Providing an Input Port . . . and a Plurality of Output Ports" ..............................................28

II.   The Board Properly Construed "Port" to Have Its Plain Meaning .................32

A.   Capella's Claim Construction Argument Depends on Arguments that Capella Did Not Raise Below and Are Waived .......................................33

B.   The Claims, Specification, and Extrinsic Evidence Support the Board's Construction of the Term "Port"....................................................35

    1.   The Claims, Specification, and Extrinsic Evidence Support Construing "Port" According to Its Plain and Ordinary Meaning ...36

    2.   Capella Cannot Demonstrate a Clear Disavowal of Claim Scope to Support Its Construction That "Port" Should Be Narrowly Construed ........................................................................................41

    3.   Capella Cannot Show that Reversal is Warranted...........................46

III.   The Board's Combination of Bouevitch With Smith, Carr, or Sparks Is Supported by Substantial Evidence and Does Not Destroy Bouevitch's Principle of Operation .......................................................................................47

A.   Obviousness Combinations Supported by Substantial Evidence Must Be Upheld..................................................................................................48

B.  Bouevitch's Discloses Power Control Based on the Same Angular Misalignment Technique as the Other References ...................................49

IV.  The Board Correctly Determined That Smith Is Prior Art in the Cisco IPRs .57

A.  Capella Had Notice and a Fair Opportunity to Address Smith and Cisco's Supplemental Briefing on Dynamic Drinkware.........................59

B.  The Board Acted Within Its Authority and Properly Allowed the Parties to Address Dynamic Drinkware Because the Case Changed PTO Procedures for Determining § 102(e) Prior Art ..............................63

CONCLUSION ......................................................................................66

# TABLE OF AUTHORITIES

Page(s)

CASES

Adickes v. S. H. Kress & Co.,
398 U.S. 144 (1970).............................................................34

Am. Piledriving Equip., Inc. v. Geoquip, Inc.,
637 F.3d 1324 (Fed. Cir. 2011) ..........................................44

Apple, Inc. v. Samsung Elecs., Ltd.,
2016 WL 5864573 (Fed. Cir. Oct. 7, 2016) .......................34

Applied Med. Resources Corp. v. U.S. Surgical Corp.,
448 F.3d 1324 (Fed. Cir. 2006) ..........................................40

Belden Inc. v. Berk-Tek LLC,
805 F.3d 1064 (Fed. Cir. 2015) .............................58, 60, 63

C.R. Bard, Inc. v. U.S. Surgical Corp.,
388 F.3d 858 (Fed. Cir. 2004) ............................................44

Conoco, Inc. v. Energy & Envtl. Int'l, L.C.,
460 F.3d 1349 (Fed. Cir. 2006) ....................................22, 33

Cuozzo Speed Techs., LLC v. Lee,
136 S. Ct. 2131 (2016).............................21, 24, 27, 32, 65

Cutsforth, Inc. v. Motivepower, Inc.,
643 F. App'x 1008 (Fed. Cir. 2016) ...................................31

Dell Inc. v. Acceleron, LLC,
818 F.3d 1293 (Fed. Cir. 2016) ....................................61, 62

Dynamic Drinkware LLC v. National Graphics, Inc.,
800 F.3d 1375 (Fed. Cir. 2015) . 16, 17, 19, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66

Epistar Corp. v. Int'l Trade Comm'n,
566 F.3d 1321 (Fed. Cir. 2009) ..........................................41

Ex parte Yamaguchi,
88 U.S.P.Q.2d 1606 (B.P.A.I. 2008) .................16, 57, 64, 65

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
  582 F.3d 1288 (Fed. Cir. 2009) .........................................................23

*In re Butler*,
  No. 98-1555, 1999 WL 164952 (Fed. Cir. Mar. 23, 1999) ................56

*In re Cuozzo Speed Techs.*,
  LLC, 793 F.3d 1268 (Fed. Cir. 2015 ...............................................48

*In re Fulton*,
  391 F.3d 1195 (Fed. Cir. 2004) ......................................29, 49, 50, 51

*In re Giacomini*,
  612 F.3d 1380 (Fed. Cir. 2010) .......................................................16

*In re Gordon*,
  733 F.2d 900 (Fed. Cir. 1984) .........................................................55

*In re Jolley*,
  308 F.3d 1317 (Fed. Cir. 2002) .......................................................50

*In re Keller*,
  642 F.2d 413 (CCPA 1981) .............................................................48

*In re Mouttet*,
  686 F.3d 1322 (Fed. Cir. 2012) .......................................48, 51, 53, 54

*In re Schweickert*,
  No. 2016-1266, 2017 WL 371374 (Fed. Cir. Jan. 26, 2017)............56

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004) ...........................................39, 42, 44

*Interactive Gift Exp., Inc. v. Compuserve Inc.*,
  256 F.3d 1323 (Fed. Cir. 2001) .......................................................34

*Johns Hopkins Univ. v. CellPro, Inc.*,
  152 F.3d 1342 (Fed. Cir. 1998) .......................................................23

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007)...................................................................48, 55

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  358 F.3d 898 (Fed. Cir. 2004) ............................................................38, 39, 43

*Lund. Deckers Corp. v. U.S.*,
  752 F.3d 949 (Fed. Cir. 2014) ...........................................................64

*MCM Portfolio LLC v. Hewlett-Packard Co.*,
  812 F.3d 1284 (Fed. Cir. 2015) .........................................................23, 33

*Meyer Intellectual Properties Ltd. v. Bodum, Inc.*,
  690 F.3d 1354 (Fed. Cir. 2012) .........................................................25

*Oatey Co. v. IPS Corp.*,
  514 F.3d 1271 (Fed. Cir. 2008) .........................................................27, 38

*PPC Broadband, Inc. v. Corning Optical Communications RF, LLC*,
  815 F.3d 747 (Fed. Cir. 2016) ...........................................................39, 40

*Plas-Pak Indus., Inc. v. Sulzer Mixpac AG*,
  600 F. App'x 755 (Fed. Cir. 2015) ....................................................53

*Pride Mobility Prods. Corp. v. Permobil, Inc.*,
  818 F.3d 1307 (Fed. Cir. 2016) .........................................................30

*Process Control Corp. v. HydReclaim Corp.*,
  190 F.3d 1350 (Fed. Cir. 1999) .........................................................30

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
  242 F.3d 1337 (Fed. Cir. 2001) .........................................................42

*Sevenson Envtl. Servs., Inc. v. U.S.*,
  76 Fed. Cl. 51 (Fed. Cl. 2007) ...........................................................44

*Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*,
  620 F.3d 1305 (Fed. Cir. 2010) .........................................................41

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
  299 F.3d 1313 (Fed. Cir. 2002) .........................................................27, 38

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
  247 F.3d 1316 (Fed. Cir. 2001) .........................................................38

vi

*Thorner v. Sony Computer Entertainment America LLC*,
   669 F.3d 1362 (Fed. Cir. 2012) ............................................................41, 42, 43

*Ventana Medical Systems, Inc. v. Biogenex Labs., Inc.*,
   473 F.3d 1173 (Fed. Cir. 2006) ............................................................41, 42, 45

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ............................................................26

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015) ............................................................27, 30

## STATUTES

5 U.S.C. § 554 ............................................................58, 59, 60

35 U.S.C. § 102(e) ............................................................57, 59, 63, 64, 65

35 U.S.C. § 103(a) ............................................................16

35 U.S.C. § 111(b)'s ............................................................64

35 U.S.C. § 119(e) ............................................................57

35 U.S.C. § 122(b) ............................................................64

35 U.S.C. § 314(d) ............................................................65

## OTHER AUTHORITIES

37 C.F.R. 42.20(d) ............................................................16

37 C.F.R. § 42.20(d) ............................................................63

37 C.F.R. § 42.71(d)(2) ............................................................60

37 C.F.R. § 42.100(b) ............................................................21, 24, 32, 35

## TABLE OF ABBREVIATIONS

| APA | Administrative Procedure Act |
|---|---|
| Appellees | all Appellees collectively |
| Appx____ | Joint Appendix page ____ |
| Board | Patent Trial and Appeal Board |
| Bouevitch | U.S. Patent No. 6,498,872 (Appx04846-04868) |
| Br. | Principal Brief for Appellant |
| Capella | Appellant Capella Photonics, Inc. |
| Carr | U.S. Patent No. 6,442,307 (Appx07734-07753) |
| IPR | *Inter partes* review |
| Lin | U.S. Patent No. 5,661,591 (Appx04993-05007) |
| PTO | U.S. Patent and Trademark Office |
| Smith | U.S. Patent No. 6,798,941 (Appx04869-04892) |
| Sparks | U.S. Patent No. 6,625,340 (Appx07754-07761) |
| '217 provisional | U.S. Provisional Patent Application No. 60/277,217 (Appx04930-04970) |
| '368 patent | U.S. Patent No. RE42,368 (Appx00245-00266) |
| '678 patent | U.S. Patent No. RE42,678 (Appx00267-00290) |

**STATEMENT OF RELATED CASES**

There are four pending patent infringement lawsuits brought by Capella that were consolidated into *Capella Photonics, Inc. v. Cisco Systems, Inc. et al.*, No. C-14-3348 (N.D. Cal.) and have been stayed in their entirety pending final exhaustion of all relevant review proceedings, including these appeals. Counsel for Appellees is not aware of any other potentially related cases.

## INTRODUCTION

In six separate IPR proceedings, the Board properly found that claims 1-4, 9, 10, 13, 17, 19-23, 27, 29, 44-46, 53, and 61-65 of the '678 patent and claims 1-6, 9-13, and 15-22 of the '368 patent would have been obvious to a person of ordinary skill in the art based on no less than three different prior art combinations.

*First*, the Board properly found that the claimed "port" does not need to be a "fiber collimator." Capella argues, for the first time on appeal, that this finding ignores the claim term "providing." Capella's argument fails because the Board correctly found that separate features in Bouevitch disclose these separate claim terms "port" and "fiber collimator." In so doing, the Board did not ignore or misconstrue the claim language.

*Second*, the Board's broadest reasonable interpretation of "port" is supported by the claim language and Capella's own use of the term in describing the alleged invention. Capella contends that statements in the specification serve to limit the term but these statements are not definitions and do not narrow the plain meaning of port that encompasses a circulator port. Thus, the Board properly found that Bouevitch's circulator ports satisfy the three claimed ports.

*Third*, the Board correctly found that the combination of Bouevitch with one of Smith, Carr, or Sparks does not destroy Bouevitch's principle of operation. Capella contends that Bouevitch's principle of operation should be limited to

1

minimizing misalignment. But Capella's argument fails because Bouevitch discloses power control based on the same angular misalignment technique disclosed in the other references and thus the obviousness combinations are consistent with, and do not destroy, Bouevitch's principle of operation.

*Fourth*, the Board correctly found that Smith qualifies as prior art. Capella does not challenge that determination on the merits but rather asserts an alleged APA procedural issue even though it did not seek relief from the Board. Capella's objection to the Board's order based on the APA is without merit because it had notice and ample opportunity to respond to all evidence and arguments.

## STATEMENT OF THE ISSUES

1. Whether the Board correctly found that the disclosure of two prior art features can be applied to satisfy the two separate claim elements "fiber collimators" and "ports" under their plain and ordinary meaning instead of requiring that a single prior art feature must disclose both claim elements.

2. Whether the Board, applying the broadest reasonable interpretation standard, properly found that the claimed "ports" include circulator ports because the claim language and intrinsic record support that interpretation.

3. Whether the Board correctly determined that the combination of Bouevitch with one of three secondary references did not destroy Bouevitch's principle of operation because Bouevitch discloses the same angular misalignment

technique using a single-axis mirror that the secondary references teach using a two-axis mirror.

4. Whether the Board correctly relied upon the parties' submissions that the Board expressly authorized to discuss the impact of a decision issued by this Court after providing the parties with notice and opportunity to address all evidence and arguments of record.

## STATEMENT OF THE CASE

### A.    The '368 and '678 Patents

Fiber-optic communication networks employ wavelength division multiplexing (WDM) to allow the transmission of multiple data channels on a single optical fiber by separating an optical signal into different wavelengths of light for different data channels, thereby significantly enhancing the bandwidth of the fiber.    Appx00259(1:37-42, 1:63-67).[1]    An optical add-drop multiplexer (OADM) is used both to remove (or drop) wavelengths from an optical fiber and to add wavelengths back onto the fiber. *Id*. 1:45–51.

The '368 and '678 patents describe an apparatus that "uses a diffraction grating to separate a multi-wavelength optical signal by wavelength into multiple spectral channels, which are then focused onto an array of corresponding channel

---

[1] Because the patents share a specification, Appellees cite to one of the specifications for ease of reference. The same language is found in both patents.

micromirrors." Appx00245, Abstract.  The channel micromirrors "are individually controllable and continuously pivotable to reflect the spectral channels into selected output ports."  *Id*.  The micromirrors may be Micro Electro-Mechanical Systems ("MEMS") tilt mirrors.  The disclosed apparatus may be used to construct OADMs for WDM optical networking applications.  *Id*.

The '368 and '678 patents claim priority to the '217 provisional. Appx00245; Appx00267.  The '217 provisional shows that the purported invention uses "port" generically and encompasses circulator ports.  The provisional states that "[t]hree different OADM architectures disclosed in the present invention are shown in Figures 7-9."  Appx04933.[2]  Figure 9 (reproduced below) shows the purported invention where circulators are used, and refers to ports of the circulators in the figure as "Port 1," "Port 2," etc.  Appx04945.  The provisional expressly states that a circulator port is a type of "port."  Appx04932.  The provisional also uses the term "add/drop ports" to refer to ports including circulator ports, and also refers to "physical input/output ports."  Appx04933.

---

[2] Where evidence, arguments, or determinations are duplicated across the appellate records, Appellees cite to one instance for ease of reference.



Appx04945, Figure 9.

The '368 and '678 patents do not use the term "physical port" in the patent claims and simply use the generic term "port." Appx00265(14:6-11). The '368 and '678 patents also use "add port" and "drop port" as claim terms, which are consistent with ports that include circulator ports in the '217 provisional. Appx00266(15:10-11, 15:28-29); Appx00289(17:34-37).

The '368 and '678 patents are reissue patents. Appx00245; Appx00267. According to Capella, the claims of the original patents (which included the "fiber collimator" and "port" limitations) were invalid over Bouevitch and in further view of three additional references. Appx04545-04546; Appx04727. During reissue prosecution of both patents, Capella identified two elements that it alleged needed to be added to its claims, namely (1) continuous individual control of micromirrors in two-dimensions, and (2) use of micromirrors for power control:

> At least one error upon which reissue is based is described as follows:
> **Claim 1 is deemed to be too broad and invalid in view of U.S. Patent No. 6,498,872 to Bouevitch** and further in view of one or

more of U.S. Patent No. 6,567,574 to Ma, U.S. Patent No. 6,256,430 to Jin, or U.S. Patent No. 6,631,222 to Wagener **by failing to include limitations regarding the spatial array of beam deflecting elements being individually and continuously controllable in two dimensions to control the power of the spectral channels reflected to selected output ports**, as indicated by the amendments to Claim 1 in the Preliminary Amendment.

Appx04545-04546 (emphasis added) *see* Appx04727.

Claim 1 of the '368 reissue patent reads:

1. An optical add-drop apparatus comprising

an input port for an input multi-wavelength optical signal having first spectral channels;

one or more other ports for second spectral channels; an output port for an output multi-wavelength optical signal;

a wavelength-selective device for spatially separating said spectral channels; [and]

a spatial array of beam-deflecting elements positioned such that each element receives a corresponding one of said spectral channels, each of said elements being individually and continuously controllable *in two dimensions* to reflect its corresponding spectral channel to a selected one of said ports *and to control the power of the spectral channel reflected to said selected port.*

Appx00265(14:6-20) (emphasis in original).  Similarly, claim 1 of the '678 reissue

patent reads:

1. A wavelength-separating-routing apparatus, comprising:

a) multiple fiber collimators, providing an input port for a multi-wavelength optical signal and a plurality of output ports;

b) a wavelength-separator, for separating said multiwavelength optical signal from said input port into multiple spectral channels;

c) a beam-focuser, for focusing said spectral channels into corresponding spectral spots; and

d) a spatial array of channel micromirrors positioned such that each channel micromirror receives one of said spectral channels, said channel micromirrors being **pivotal about two axes and being** individually and continuously controllable to reflect [[said]] **corresponding received** spectral channels into **any** selected ones of said output ports **and to control the power of said received spectral channels coupled into said output ports**.

Appx000287(14:6-23) (emphasis in original). Although Capella attempted to differentiate its patent claims over Bouevitch in the reissue prosecution, the purportedly distinguishing features of two axis micromirrors for power control were also known before the alleged invention.

### B.   Bouevitch Describes a MEMS-Based Dynamic Gain Equalizer and a MEMS-Based Switching Device

Bouevitch describes an optical device for rerouting and modifying an optical signal. Appx04846, Abstract. The disclosed device includes a MEMS array for reflecting an optical signal and operates as a dynamic gain equalizer (DGE) and a configurable optical add/drop multiplexer (COADM). *Id*. The MEMS array is used to attenuate signals in the DGE device and functions as a switching array in the COADM. *Id*.

Bouevitch teaches that the COADM structure disclosed also works as a DGE. Figure 11 of Bouevitch discloses a COADM using MEMS mirrors that tilt in one axis for switching. Appx04865(14:14-65); Appx04857, Fig. 11. Bouevitch

states that the MEMS tilt mirrors are suitable "for both COADM and DGE applications." Appx04865(13:65-14:1); Appx04864(12:38-39). Bouevitch discloses both COADM and DGE applications separately for clarity. Figure 11 is a "preferred" COADM embodiment of Fig. 9. Appx04865(14:14-16). Figure 9 is a combined "DGE/COADM." Appx04860(4:50-54). Figures 9 and 11 (reproduced below) share a common optical structure referred to as a 4-*f* design.



FIG. 9                    FIG. 11

Appx04853, Fig. 9; Appx04857, Fig. 11.

Thus, Bouevitch teaches using MEMS tilt mirrors for both switching and power control. Importantly, Bouevitch does not seek to eliminate misalignment when operating the tilt mirrors, but explains that misalignment attenuates the signal for power control. Specifically, Bouevitch states that the "degree of attenuation is based on the degree of deflection provided by the reflector (*i.e.*, the angle of reflection)." Appx04862(7:35-37); *see also* Appx04865(14:5-13) ("the angular displacement provided by each MEMS reflector"). Bouevitch teaches using a tilt

mirror to deflect an optical signal at an angle to cause attenuation. *See* Appx04862(7:35-37). Thus, the angle of tilt of the MEMS mirror attenuates the optical signal by controlling the amount of misalignment.

To perform switching in Figure 11 above, Bouevitch states that an optical signal carrying wavelengths $\lambda_1$ and $\lambda_2$, is "launched into port 1 of the first optical circulator 80a," sent through optical waveguide 99a, and "transmitted through the microlens 12a to the lens 90." Appx04865(14:39-44). The signal is transmitted to an upper portion of the spherical reflector 10, dispersed by diffraction grating 20 into two beams carrying wavelengths $\lambda_1$ and $\lambda_2$, reflected by a lower portion of spherical reflector 10, and transmitted to reflectors 51 and 52 of MEMS array 50. Appx04865(14:44-55). Light carrying wavelengths $\lambda_1$ is reflected back by reflector 51 through the system and out at port 3 of circulator 80a. Appx04865 (14:55-60). Light carrying wavelengths $\lambda_2$ is reflected back by at a different angle by reflector 52 and sent out at port 3 of circulator 80b. Appx04865(14:60-65).

### C.    Smith, Carr, and Sparks Disclose Dynamic Gain Equalizers With Two-Axis Mirrors

Smith, Carr, and Sparks use two-axis mirrors in gain equalization systems for the same power control by misalignment as disclosed in Bouevitch.

Smith discloses a "two-dimensional array of two-axis tiltable mirrors," Appx04888(16:9-11), where mirror rotation in one axis controls switching and

mirror rotation in a second axis controls power. Appx04888(16:34-37) ("[T]he principal switching operations us[e] the one mirror tilt axis. The other mirror tilt axis, the minor axis, can be used for power adjustment…."); *see* Appx04888 (16:34-51, 55-59); Appx04889(17:53-18:25, 18:54-67) ("Equalization may be achieved by reducing the angle on the minor axis…."); Appx04879, Fig. 16.

Carr discloses a two-dimensional array of double-gimbaled (*i.e.*, two axis) movable MEMS mirrors that can be tilted to "any desired orientation." Appx07748(3:44-48); Appx07738, Fig. 2B. Carr describes orienting the mirror to "reflect the input signal to a different output fiber" for an add/drop switch or "selecting the tilt (or bend) angle of relevant mirrors slightly off the angle of maximum signal reflection … for the purpose of gain equalizing." Appx07752 (11:11-12:5).

Similarly, Sparks describes "movable micromirrors (16, 26), which are fabricated using MEMS technology and are capable of two axis movement," Appx07760(4:42-45), and states that by controlling the misalignment of the optical beam path "each of the channels passing through the switch may be attenuated to whatever degree necessary to achieve the desired effect, e.g. equalisation [sic] of optical power across all channels." Appx07759(2:26-36).

Thus, each of Smith, Carr, and Sparks enhances the teaching of angular misalignment for power control in Bouevitch by using two-axis mirrors in a gain

equalizer system.  Moreover, all of these prior art references recognized (1) the use of tilt mirrors for optical switching purposes in devices such as COADMs or add/drop switches and (2) the use of tilt mirrors to create angular misalignment for power control in dynamic gain equalizers.

### D.    Proceedings at the Patent Trial and Appeal Board

The Board found that the challenged claims of the '678 and '368 patents were unpatentable in each of three separate sets of IPR proceedings.

(1) In IPR2014-01166, IPR2014-01276, IPR2015-00816, and IPR2015-00894 (the "Cisco IPRs"), the Board ordered that claims 1-4, 9, 10, 13, 17, 19-23, 27, 29, 44-46, 53, and 61-65 of the '678 patent and claims 1-6, 9-13, and 15-22 of the '368 patent were unpatentable based on the combination of at least Bouevitch, Smith, and Lin.  Appx00043, Appx00095.

(2) In IPR2014-00726, IPR2014-00727, IPR2015-01958, and IPR2015-01961 (the "FNC IPRs"), the Board ordered that the challenged claims of the '678 and '368 patents were unpatentable based on the combination of Bouevitch and either Carr or Sparks.  Appx00122, Appx00153.

(3) In IPR2014-00731, IPR2014-00739, IPR2015-01969, and IPR2015-01971 (the "Lumentum IPRs"), the Board ordered that the challenged claims of the '678 and '368 patents were unpatentable based on the combination of at least Bouevitch, Sparks, and Lin.  Appx00193-00194, Appx00241-00242.

### 1.    "Providing" and "Port"

Throughout all of these IPR proceedings, Capella never offered express constructions for the terms "fiber collimators," "providing," or "port." Appx00012 ("Patent Owner offers no definition of 'port…'"); Appx00057 ("Patent Owner did not propose an express meaning of "providing…"); Appx00058, Appx00108, Appx00139; Appx00168-00169; Appx00211. The terms "fiber collimators" and "providing" do not appear in the claims of the '368 patent. Appx00265-00266 (14:5-16:37). The Board did not separately construe "fiber collimators" but, in the Cisco IPRs, it did interpret the term "providing" for purposes of the '678 patent. Appx00057.

In addressing the term "providing," the Board concluded that "to the extent Patent Owner [could] be understood to be arguing for a construction of 'providing' that requires that only one collimator directly provide one port," this argument was without merit. Appx00058. In reaching its conclusion, the Board observed that the '217 provisional "disclosed ports being made available through both collimators and circulators." *Id*. Thus, the Board determined that the specification of the '678 patent supported applying "the plain and ordinary meaning of 'providing' as 'making available.'" Appx00058.

Regarding the term "port," the Board stated that there is "no dispute that the ordinary and customary meaning of 'port' encompasses circulator ports, and,

indeed, any 'point of entry or exit of light.'" Appx00058. The Board noted the testimony of Capella's expert that "circulator ports are ports with constraints." *Id*.

The Board also found that the '678 patent does not "equate the term 'port' to 'collimator,' as both 'port' and 'collimator' appear separately in the claims of the '678 patent." *Id*. On this issue, the Board stated "that even if certain fiber collimators serve as ports in the '678 patent, that does not redefine the term 'port' to mean 'collimator.'" Appx00059. The Board declined to "read limitations from the specification into the claims." Appx00071.

The Board also considered in detail Capella's argument that a "port" is not a circulator port. Appx00058. Capella argued that there was a disavowal of claim scope that would otherwise include circulator ports because the patents describe "a scalable system without circulator ports" and "consistently emphasized the limitations of circulator-based switches." Appx00059. The Board disagreed, stating that Capella's expert only testified that the '368 and '678 patents discourage the use of circulators, which is insufficient to constitute a disavowal. Appx00060. The Board found that the use of circulator ports as "ports" in describing the invention in the related '217 provisional undermined Capella's disavowal argument. *Id*. The Board concluded that there was insufficient support to find a disavowal of claim scope as Capella contended. *Id*.

### 2.   Obviousness Findings

In accordance with these interpretations, the Board stated "Bouevitch discloses the 'multiple fiber collimators, providing an input port . . . and a plurality of output ports,' as recited by claim 1." Appx00072. Furthermore, the Board found that Bouevitch discloses all of the recited limitations of claim 1 of the '368 patent and claim 1 of the '678 patent on a single axis. Appx00027; Appx00077. The Board combined Bouevitch with Smith, Carr, or Sparks for the two-axis (or two-dimension) requirement.

The Board provided numerous reasons why a skilled artisan would have modified Bouevitch to have two-axis mirrors. *E.g.*, Appx00034 (stating that Smith's two-axis mirrors would "reduce the risk of the signal bleeding into a port that is adjacent to the output port along the switching axis, and would provide finer control over the attenuation value"); Appx00117 (stating that Carr's two-axis MEMS device "permits precise control of the mirrors, a more robust structure, greater packing density, larger mirror sizes, and larger mirror rotation angles" (internal quotations omitted)); Appx00182 ("Sparks expressly states that an advantage of the optical switches with two-axis mirrors is that attenuation (*i.e.*, power control) can be achieved without incorporating separate attenuators within the system."). The Board also adequately described the bases for its obviousness determinations by explaining why it credited the Appellees' experts' testimony and

14

why Capella failed to rebut the reasons for the combinations.  Appx00033-00034;

Appx00083-00084;    Appx00117-00118;    Appx00148-00149;    Appx00184;

Appx00228.

The Board also considered Capella's argument that the combination of

Bouevitch with one of the other references (Smith, Carr, or Sparks) would destroy

Bouevitch's principle of operation.    Appx00032; Appx00082; Appx00114;

Appx00145; Appx00183; Appx00227.    For example, Capella asserted that

Bouevitch "autocorrects for any unintentional misalignments" while the other

references control power through intentional misalignment.    Appx00114;

Appx00145-00146.  But the Board found that Bouevitch discloses the "degree of

attenuation is based on the degree of deflection provided by the reflector (*i.e.*, the

angle of reflection)."  Appx00115; Appx00146.  Based on this teaching of angular

misalignment to control power in Bouevitch, the Board found no inconsistency

between  Bouevitch's  disclosure  of  methods  that  prevent  unintentional

misalignment  and  its  disclosure  of  methods  that  incorporate  intentional

misalignment for power control.  Appx00116; Appx00147.  The Board also

reasoned that Capella's "articulation of the intended purpose of Bouevitch focuses

on only one objective, and fails to address what Bouevitch discloses as a whole to

one of skill in the art."  Appx00183; Appx00228.  Thus, the Board rejected

Capella's contention that the combination would destroy Bouevitch's principle of operation.  Appx00116; Appx00147; Appx00183; Appx00228.

### 3.    Smith

In the Cisco IPRs, the parties disputed whether Smith qualified as prior art. To qualify Smith as prior art based on the filing date of the '683 Smith provisional, the Cisco IPR petitioners presented evidence in the petitions that the relevant, relied upon disclosure of the '683 Smith provisional reference was carried through to Smith.    Appx00346-00347 (citing Appx05295-05285); Appx00897-00898 (citing Appx05401-05413).    After this Court issued *Dynamic Drinkware LLC v. National Graphics, Inc.*, 800 F.3d 1375 (Fed. Cir. 2015), Cisco contacted the Board for guidance.  Appx00690; Appx01192.  In response, the Board issued an order that stated:

> We … are interested in the parties' views on the impact, if any, of *Dynamic Drinkware* on these proceedings and, in accordance with § 37 C.F.R. 42.20(d), request additional briefing to address the following:
>
> (1) what a party must show to establish that a patent is prior art as of the date of its provisional application when relied upon to challenge claims in an *inter partes* review proceeding alleging obviousness under 35 U.S.C. § 103(a), particularly with respect to whether *Dynamic Drinkware* altered the required showing;
>
> (2) whether *Dynamic Drinkware* is consistent with, or conflicts with, *In re Giacomini*, 612 F.3d 1380, 1383 (Fed. Cir. 2010) or *Ex parte Yamaguchi*, 88 U.S.P.Q.2d 1606 (B.P.A.I. 2008);

16

> **(3) whether the Smith '683 Provisional provides written description support for the claims of Smith.**
>
> **Each party shall be limited to five (5) pages, not including the cover sheet or certificate of service, for their respective briefs, which shall be strictly limited to the issues identified above.** Petitioner may additionally include as an exhibit to its brief a claim chart not to exceed five (5) pages showing where the Smith '683 Provisional provides written description support for the claims of Smith. **The claim chart may not include any argument or explanatory text.**

Appx00690-00691; Appx01192-01193 (emphasis added). The parties made their respective submissions as authorized by the Board's order. Appx00711-00722; Appx00739-00746; Appx01224-01235; Appx01252-01259. Neither side offered new evidence or expert testimony on these issues, relying instead on the existing record. At the Board hearing, Capella discussed the *Dynamic Drinkware* decision and the parties' submissions at length but did not seek any further relief. Appx00803-00811; Appx01316-01324. Capella did not raise the prior art status of Smith in its requests for rehearing. Appx00836-00850; Appx01349-01363.

## SUMMARY OF THE ARGUMENT

The Board properly found in six separate IPR proceedings that claims 1-4, 9, 10, 13, 17, 19-23, 27, 29, 44-46, 53, and 61-65 of the '678 patent and claims 1-6, 9-13, and 15-22 of the '368 patent would have been obvious to a person of ordinary skill in the art based on no less than three different prior art combinations.

*First*, the Board properly found that the claimed "port" does not need to be a "fiber collimator."[3]   Capella argues that a "port" must be a "fiber collimator" because of the claim language "fiber collimators, providing an input port … and a plurality of output ports."   But Capella has waived its argument because it did not offer a construction for the term "providing" below and does not offer a specific construction on appeal.   Moreover, the intrinsic and extrinsic record confirms the Board's construction and substantial evidence supports the Board's finding that Bouevitch discloses this claim limitation.   Capella's interpretation is contrary to the plain and ordinary meaning of the term "providing" and contrary to the record evidence.

*Second*, the Board's broadest reasonable interpretation of "port" is supported by the claim language and Capella's own use of the term in describing the alleged invention.   Capella contends that statements in the specification limit the scope of the term "port," but these statements are not definitions.   Capella cannot show any disavowal of claim scope, and thus the plain meaning of "port" that encompasses a

---

[3] The Board found that Bouevitch's two microlenses meet the fiber collimator limitations.   Capella's claim that the Board found the term fiber collimator is "taught or suggested by the non-fiber collimator circulator discussed in Bouevitch" is incorrect.   (Br. 4-5.)   Later, Capella agrees that "the Board found that Bouevitch's two microlenses teach or suggest fiber collimators." (Br. 21.)

circulator port applies. Thus, the Board properly found that Bouevitch's circulator ports satisfy the three claimed ports.

*Third*, the Board correctly found that the combination of Bouevitch with one of Smith, Carr, or Sparks does not destroy Bouevitch's principle of operation. Capella contends that Bouevitch's principle of operation should be limited to minimizing misalignment. But a plain reading of Bouevitch and the parties' expert testimony contradicts Capella's narrow reading because Bouevitch discloses power control based on the same angular misalignment technique in the other references. Thus, the combinations are consistent with the teachings of Bouevitch and substantial evidence supports the Board's obviousness findings.

*Fourth*, the Board did not deny Capella an opportunity to respond to all evidence and arguments presented on the prior art status of Smith. Capella claims a lack of opportunity to address Cisco's arguments after the *Dynamic Drinkware* decision. Capella's argument fails because it responded to Cisco's arguments, made a full presentation on the prior art status of Smith at the Board hearing, and did not seek relief from the Board.

# ARGUMENT

## I. The Board Properly Determined That Bouevitch Discloses "Fiber Collimators, Providing an Input Port . . . and a Plurality of Output Ports" as Recited in the Challenged Claims of the '678 Patent

Capella argues that the Board "made two fatal errors" in its determination that Bouevitch's microlenses correspond to the "fiber collimators, providing an input port . . . and a plurality of output ports" as recited in claims 1-4, 9, 10, 13, 17, 19-23, 27, 29, 44-46, and 53 of the '678 patent: first, that the Board's "claim construction improperly ignores the explicit claim language and is inconsistent with the specification"; and second, that "the Board applied the improper claim construction in its obviousness analysis to improperly find a circulator in Bouevitch could meet the fiber collimator providing a port." (Br. 17.) To the extent these arguments have been preserved for appeal, they are without merit.

As an initial matter, Capella has waived the claim construction argument it now makes. In its brief, Capella does not identify a term or construction on which the Board purportedly erred, nor proposes a specific construction for any particular term. Capella's argument appears to rest on a narrow construction of the term "providing" that Capella did not raise below and thus has waived. Even if not waived, Capella's implicit construction is contrary to the plain and ordinary meaning of the term, would read out a disclosed embodiment, and would effectively import purported limitations from the specification into the claims.

Capella's obviousness argument on appeal that the Board improperly pulled in additional elements in finding that Bouevitch's microlenses provide an input port and a plurality of output ports is unfounded because substantial evidence supports the Board's finding.  (Br. 21.)  Capella's argument rests entirely on its belated and incorrect claim construction argument regarding "providing," and thus also fails.

### A. Capella's Claim Construction Argument Implicitly Depends on an Overly Narrow Construction of "Providing" That Capella Did Not Raise Below and Is Unsupported by the Intrinsic and Extrinsic Evidence

#### 1. Capella's Unspecified Claim Construction Requires a Narrow Construction of the Term "Providing"

In an IPR, claim terms are to be given their "broadest reasonable interpretation."  37 C.F.R. § 42.100(b); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142 (2016).  Despite this clear standard, Capella argues that the Board did not interpret the following claim limitations narrowly enough:

- "multiple fiber collimators, providing an input port for a multi-wavelength optical signal and a plurality of output ports;" Appx00287(14:8-10) ('678 patent, claim 1); Appx00288(15:31-33) ('678 patent, claim 21);

- "an array of fiber collimators, providing an input port for a multi-wavelength optical signal and a plurality of output ports including a pass-through port and one or more drop ports;" Appx00289 (17:34-37) ('678 patent, claim 44).

(Br. 18-19.) Capella does not identify any specific term or claim construction for which the Board purportedly erred. Instead, Capella argues that, with respect to these limitations, "the claims require that fiber collimators provide at least three ports." (Br. 17; *see also id.* at 19.) Specifically, Capella argues that the claim language reciting fiber collimators "providing" the claimed ports means that the fiber collimators themselves *constitute* or *serve as* the ports, such that there is a one-to-one correspondence between each fiber collimator and each port. (*See* Br. 21 (arguing that Bouevitch does not read upon "fiber collimators, providing an input port . . . and a plurality of output ports" because Bouevitch's microlenses (fiber collimators) themselves do not constitute three ports); 28 ("fiber collimators *serve* as *both* the input ports and the output ports"); 29.) Capella effectively seeks a narrow construction of the term "providing" as "constituting" or "serving as" on appeal.

### 2. Capella Never Offered a Construction of the Term "Providing" Below So Its New Argument Is Waived

Capella did not seek a construction of "providing" at the Board. Its argument violates the rule that "a party may not introduce new claim construction arguments on appeal or alter the scope of the claim construction positions it took below." *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1358–59 (Fed. Cir. 2006). In such situations, the appellant's new or altered claim construction

argument is deemed to be waived, because "[a]s a general rule, an appellate court will not hear on appeal issues that were not clearly raised in the proceedings below." *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1362 (Fed. Cir. 1998).

In order to preserve an issue for appeal, a party must *clearly raise and develop* the issue below. *CellPro, Inc.*, 152 F.3d at 1362; *MCM Portfolio LLC v. Hewlett-Packard Co.*, 812 F.3d 1284, 1294 n.3 (Fed. Cir. 2015) (citing *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1296 (Fed. Cir. 2009) ("If a party fails to raise an argument before the trial court, or presents only a skeletal or undeveloped argument to the trial court, we may deem that argument waived on appeal…."))  For example, in *Google Inc. v. SimpleAir, Inc.* this Court concluded that the petitioner in an IPR waived a claim construction argument advanced on appeal because the petitioner did not raise the argument below.  No. 2016-1901, 2017 WL 1149518 at *3-4 (Fed. Cir. Mar. 28, 2017).  The Court concluded that the petitioner's arguments in its petition below "were no more than vague insinuations, seeds of doubt that [petitioner] perhaps hoped would lead the PTAB to arrive at a different construction on its own volition." *Id.* at *3.

Here, Capella never identified "providing" as a term for construction, nor offered a proposed construction for this term.  Capella never expressly identified *any* term or proposed construction related to this argument.  Appx00071 ("Patent

Owner does not articulate any express construction of a claim term as corresponding to the 'proper meaning' to which it refers."). At best for Capella, it only sought to construe "port." *See* Appx03139; Appx03148; Appx03140; Appx03146. But even for "port," Capella never expressly identified the term for construction, nor proposed a specific construction for the term. Appx00058 ("Patent Owner offers no definition of 'port,' and does not suggest that the '678 patent provides an express definition of the term…"); Appx00139; Appx00211. Appellees address Capella's untimely and improper "port" arguments in greater detail in Section II, *infra*. For the purposes of the "providing" arguments raised in Capella's brief (Br. 17-22), however, Capella's arguments before the Board regarding the term "port" are insufficient to preserve the issue of the proper construction of the term "providing" because Capella never urged an interpretation for the term "providing." In short, Capella has waived this argument.

### 3. The '678 Patent Claims, Specification, and Extrinsic Evidence Support Construing the "Providing" According to Its Plain and Ordinary Meaning

Even if Capella had not waived its argument regarding the construction of "providing," its argument fails. Under the broadest reasonable interpretation, the term "providing" should be construed as having its plain and ordinary meaning of "making available." 37 C.F.R. § 42.100(b); *Cuozzo*, 136 S. Ct. at 2142. Although "Patent Owner did not propose an express meaning of 'providing,'" the Board in

the Cisco IPRs stated that "[i]n light of the specification of the '678 patent, we apply the plain and ordinary meaning of 'providing' as 'making available.'" Appx00057-00058.[4]

Both the claim language and specification support the Board's construction. The claims do not use "providing" other than in accordance with its plain and ordinary meaning; if the patentee wanted to impart a meaning to the claims now urged by Capella on appeal, it could have used the term "constituting" or "serving as" or even "is." Instead, the patentee used "providing," the plain and ordinary meaning of which is to "make available." Appx11385 (Webster's Ninth New Collegiate Dictionary, 948.); Appx06557 (American Heritage Dictionary, 1102) ("To make available; afford"); *see also Meyer Intellectual Properties Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1369 (Fed. Cir. 2012) (construing "providing" according to its ordinary meaning as "making available," not "constituting"). Capella's own expert testified that the term should be construed similar to the plain and ordinary meaning as "help[ing] to deliver whatever it is that it's providing." Appx06345(95:14-17).

While the Board's interpretation is consistent with the specification, Capella's urged construction that "providing" means "constituting" is contrary to

---

[4] The Board in the Lumentum and FNC IPRs did not construe the term "providing."

the specification. The '678 patent specification incorporates by reference the '217 provisional, and both patents claim priority to the provisional. Figure 9 of the '217 provisional, annotated and reproduced below, is one of "[t]hree different OADM architectures disclosed in the present invention." Appx04933; Appx04945.



Figure 9 shows the input and output (*i.e.*, "Add," "Drop") ports being made available, or provided, by the fiber collimators. Appx04945. The input and output ports of this embodiment of the '678 patent are not in a one-to-one relationship with collimators because each single fiber collimator in conjunction with a circulator makes available **two** ports, *i.e.*, one "Add" port and one "Drop" port. Thus, Capella's interpretation of "providing" would improperly exclude a disclosed embodiment. *See Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1583 (Fed. Cir. 1996). In contrast, the Cisco IPR Board's interpretation of "providing" as "making available" is consistent with the incorporated provisional disclosure showing collimators making ports available. The Board's interpretation

does not improperly read out embodiments. *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008) (citations omitted).

Moreover, the specification contains no "expressions of manifest exclusion or restriction" clearly showing that the patentee intended to deviate from the plain and ordinary meaning of "providing." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002). As the Cisco IPR Board found below, limiting the term based on portions of the specification would impermissibly import limitations from the specification into the claims, while improperly reading the '217 provisional Figure 9 embodiment out of the claims. Appx00071; *see Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1346 (Fed. Cir. 2015).

In short, had Capella preserved an argument regarding the construction of "providing," the intrinsic and extrinsic evidence of record supports construing the term according to its plain and ordinary meaning—"to make available." Capella's argument to the contrary would narrow the meaning of the term without any expression of manifest restriction by the patentee, would read out a disclosed embodiment, and would import limitations from the specification into the claims and therefore should be rejected. *Cuozzo*, 136 S. Ct. at 2142.

**B.    Substantial Evidence Supports the Board's Determination that Bouevitch Discloses "Fiber Collimators, Providing an Input Port . . . and a Plurality of Output Ports"**

Construing "providing" correctly according to its plain meaning, there is substantial evidence for the Board's conclusion that Bouevitch discloses the "multiple fiber collimators"/"array of fiber collimators" limitations of claims 1, 21, and 44.    There is no dispute that Bouevitch's microlenses (12a and 12b in the annotated Fig. 11 below) disclose the claimed fiber collimators.    (Br. 21-22); Appx03150.    And the Board properly concluded that Petitioners had submitted sufficient evidence, including expert testimony, that these microlenses provide an input port (labeled "IN," item A in the annotated image below), and a plurality of output ports (labeled "OUT EXPRESS" and "OUT DROP," items E and D in the annotated image below).    Appx00070-00072; Appx00142-00143; Appx00217-00218.



Bouevitch, Fig. 11, (Annotation 1)

Capella argues on appeal that the Board erred by "pull[ing] in additional elements"—specifically, Bouevitch's waveguides and circulators—"to meet the requirement that the claimed fiber collimators provide at least three ports." (Br. 21.)    But Appellees advanced the argument and evidence that Bouevitch's microlenses constituted fiber collimators, which in turn provided—or made available—the claimed input and output ports through its waveguides and circulators, Appx00905-00906; Appx01930-01931; Appx02919.    Appellees also provided expert testimony in support of this argument.    Appx05343-05345; Appx10143-10144; Appx11880-11882.    The Board explained its reasoning why the microlenses of Bouevitch, in conjunction with fiber waveguides and circulators, provided the claimed ports and properly relied on Appellees' evidence in support of its finding.    Appx00070-00072; Appx00142-00143; Appx00217-00218, (citations omitted); *In re Fulton*, 391 F.3d 1195, 1203 (Fed. Cir. 2004).

Furthermore, Capella's argument is entirely dependent on its claim construction of "providing" as meaning "constituting" or "serving as," which as discussed above is contrary to the intrinsic and extrinsic evidence.  While Capella cites several cases in support of its argument that "providing" should be rewritten as "constituting," it does not explain how the unique facts of those cases apply to the present appeal, and in fact those cases are distinguishable.  For example, in *In re Varma*, the Court concluded that the phrase "a statistical analysis request

corresponding to two or more selected investments" meant that the claimed request must correspond to more than one investment, and did not encompass two *separate* requests, each performing one analysis. 816 F.3d 1352, 1362 (Fed. Cir. 2016). The Court relied on the claim language, the "interlocking of singulars" as antecedent bases in one claim, and the prosecution history to conclude that the Board erred in deviating from the meaning evident from the face of the claim phrase itself. *Id.* at 1362-63. Here, Capella seeks to depart from the plain meaning of the claim phrase to rewrite "providing" as "constituting." (Br. 21-22.) As in *Varma*, the intrinsic and extrinsic evidence does not support such a construction.

Other cases cited by Capella similarly support affording "providing" its plain and ordinary meaning. *See Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1356-57 (Fed. Cir. 1999) (concluding that the claim term "a discharge rate" plainly referred to the same rate as the subsequently appearing term "the discharge rate," and that "[t]he district court's attempt to use the written description to circumvent the plain language of the claim and the clear definition of the disputed claim language found therein was inappropriate"); *Pride Mobility Prods. Corp. v. Permobil, Inc.*, 818 F.3d 1307, 1312, 1314-15 (Fed. Cir. 2016) (concluding that claim phrase "mounting plate [that] is substantially planar and is oriented perpendicular to the drive wheel axis" could not encompass an arrangement in which the drive-wheel axis was *parallel* to the planar surface of a

substantially planar mounting plate, and that the Board improperly departed from the clear meaning of the claim language based on a description in the specification); *Cutsforth, Inc. v. Motivepower, Inc.*, 643 F. App'x 1008, 1010-11 (Fed. Cir. 2016) (concluding that the Board's interpretation of "a projection extending from the mounting block" to encompass something that protrudes *into* the mounting block was erroneous where the patentee did not act as his own lexicographer).

Accordingly, Capella's challenge to the Board's determination that Bouevitch discloses "[multiple fiber collimators/an array of fiber collimators] providing an input port … and a plurality of output ports" recited in claims 1-4, 9, 10, 13, 17, 19-23, 27, 29, 44-46, and 53 of the '678 patent is without merit.

Moreover, Capella does not dispute that there is substantial evidence supporting the Board's unpatentability determinations based on the Board's interpretation of "providing." If the Board's interpretation is affirmed, the Board's merits determinations should not be disturbed. Even under Capella's narrow interpretation of "providing," the Board cannot simply be reversed absent further proceedings. The Board only made determinations in light of its construction, has not considered the art based on Capella's interpretation, and has not addressed the other record evidence presented by Petitioners in view of that interpretation, such

as Carr's teaching of "optical input fibers 120," "optical output fibers 121," and "imaging lenses 125." Appx01931; Appx07736, Fig. 1B; Appx07747(1:58-67).

## II.    The Board Properly Construed "Port" to Have Its Plain Meaning

As with Capella's "providing" construction argument, Capella asks this Court to narrowly construe "port," stripping it of its "broadest reasonable interpretation." 37 C.F.R. § 42.100(b); *Cuozzo*, 136 S. Ct. at 2142. "Port" is recited in the claims in a broad, generic fashion. For example, claim 1 of the '368 patent recites:

> 1.    An optical add-drop apparatus comprising:
>
> ***an input port*** for an input multi-wavelength optical signal having first spectral channels;
>
> ***one or more other ports*** for second spectral channels; ***an output port*** for an output multi-wavelength optical signal; . . .

Appx00265(14:6-20) (emphasis added); *see also* Appx00265(14:33-42, 56-59); Appx00266(15:5-16:2, 16:19-21); Appx00287-00290(14:6-35, 14:39-45, 15:24-54, 15:58-63, 16:17-41, 16:55-17:19, 17:31-18:2, 18:26-40, 18:55-20:3).

Despite the plain claim language, Capella argues that the claimed ports are a specific type of port—"fiber collimators"—and that the claimed ports "are separate from, coupled to, downstream of, and do not encompass, circulators." (Br. 24.) In pursuing a restrictive construction, Capella raises new arguments and evidence that it did not raise below, and thus has waived these arguments. Even if not waived,

Capella's urged interpretation of "port," which replaces a single-word term with a lengthy definition reciting negative limitations found nowhere in the claims, does not meet the broadest reasonable interpretation standard. The Board properly held that "port" should be given its plain meaning under this standard, and its construction should be affirmed.

## A.   Capella's Claim Construction Argument Depends on Arguments that Capella Did Not Raise Below and Are Waived

Capella did not seek a particular construction of "port" at the Board, and it never requested that "port" be construed as "a fiber collimator" that is "separate from, coupled to, downstream of, and do not encompass, circulators." Appx00058 ("Patent Owner offers no definition of 'port,' and does not suggest that the '678 patent provides an express definition of the term…"); Appx00139; Appx00211. Instead, Capella advocated an interpretation that required all "port" limitations to be rewritten to not be circulator ports. Now, on appeal, Capella seeks an even narrower read, replacing "port" with "fiber collimators" that are implemented in a specific way: "separate from, coupled to, downstream of, and do not encompass, circulators." Capella did not present its current construction to the Board, and thus it has waived the argument. *See MCM Portfolio*, 812 F.3d at 1294 n.3; *Conoco*, 460 F.3d 1349 at 59. Because Capella's argument for "port" is predicated on a

new construction, the Court need not address this argument and should instead affirm the Board.

Further, Capella cites to portions of the patent specification and '217 provisional that it claims supports its new construction arguments. (Br. 29-38.) Capella does not identify where each of these cites was raised as part of its arguments below. (*Id*.) Capella's failure to show where it raised its arguments to the Board is unsurprising because it did not rely on much of the evidence it now cites. For example, Capella did not rely on cites from the '217 provisional to support its erroneous interchangeable use claims in any of the IPRs. (Br. 36.) A party is not permitted to advance new arguments and evidence on appeal. *E.g., Google*, 2017 WL 1149518 at *3-4; *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1347 (Fed. Cir. 2001). Further, Capella cited evidence in some but not all of the IPRs. Capella should not be permitted to blend records. Fed. R. App. P. 10(a); *Apple, Inc. v. Samsung Elecs., Ltd.*, 2016 WL 5864573, at *2, 5-6 (Fed. Cir. Oct. 7, 2016); *see also Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 n.16 (1970). For example, Capella did not address the '217 provisional's discussion of Figure 9 in all of the IPRs. Thus, Capella's new evidence and its arguments based on that evidence should not be considered. *Id*

**B.    The Claims, Specification, and Extrinsic Evidence Support the Board's Construction of the Term "Port"**

Even if the Court were to review Capella's new evidence and arguments, the evidence does not give rise to a clear disavowal of scope as Capella contends. None of the new evidence Capella cites constitutes manifest statements of exclusion. The new evidence is cumulative of the other exemplary embodiment disclosure and at best discloses that a "port" can be—but need not be—a "fiber collimator." *See* Section II.B.1.-2., *infra*.

A claim term's broadest reasonable interpretation is determined in light of the specification. 37 C.F.R. § 42.100(b). The Board relied on the claim language consistent with the patent specification and the disclosure of the related provisional application to hold that "port" should be given its plain meaning—a meaning that is not restricted to a particular port type or that excludes certain types of ports. Appx00012-00014; Appx00058-00060; Appx00108-00109; Appx00138-0140; Appx00168-00170; Appx00211-00214. The Board confirmed its view with extrinsic evidence. *Id*. The Board correctly concluded that there is no justification for adopting a narrower construction. *Id*.

### 1.     The Claims, Specification, and Extrinsic Evidence Support Construing "Port" According to Its Plain and Ordinary Meaning

On their face, the claims do not include any words that restrict the generically-claimed "port" language to a "fiber collimator," which are separate claim elements.  Appx00265-00266 (14:6-20, 14:48-59) ; Appx00287-00290(14:6-23, 14:52-55, 14:62-64, 15:1-3, 15:30-48, 15:58-63, 15:64-67, 16:17-34, 16:52-55, 16:52-17:6, 17:27-52, 18:3-6, 18:55-20:3); Appx00012-00013; Appx00058-00059; Appx00108-00109;  Appx00139-00140;  Appx00168-00169;  Appx00212-00213. The words "fiber collimator" do not appear anywhere in the claims of the '368 patent.    Appx00265-00266.    In the '678 patent claims that include "fiber collimators," the recited collimators are separate limitations from the claimed "ports."  For example:

> multiple *fiber collimators*, providing an *input port* for a multi-wavelength optical signal and *a plurality of output ports*

Appx00287(14:8-10) (emphasis added); *see also* Appx00287-00289(14:11-35, 15:24-54, 17:31-63).   Thus, the claims contemplate that "fiber collimators" and "ports" are different structures.  Similarly, no claim language suggests or supports Capella's further restriction that "ports" "are separate from, coupled to, downstream of, and do not encompass, circulators," and Capella cites none.

The record confirms that Capella intended to claim the term "ports" in a generic way—and not to the exclusion of circulator ports. The '368 and '678 patents claim priority to the '217 provisional. Appx00245; Appx00259; Appx00267; Appx00281. As discussed above, Capella incorporated the '217 provisional by reference in the '678 patent. Appx00281(1:18-20). The '217 provisional discloses multiple embodiments, including an embodiment that uses circulator ports as shown in Figure 9:



**Bi-Directional OADM Approach (Circulator Scheme)**



Figure 9                    Capella Proprietary & Confidential

Appx04945 (annotations added to identify circulators); Appx04933. The figure identifies Ports 1-4 as circulator ports. Appx04933; Appx04945. The provisional also expressly states that a circulator port is a type of "port." Appx02750; Appx04932. Capella offers no argument or evidence that the circulator embodiment included in Figure 9, which is described as part of "the present invention"—was disclaimed or should be excluded from the scope of the claims.

Thus, the Figure 9 embodiment remains part of the patent disclosure and should not be read out of the claims. *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1329 (Fed. Cir. 2001); M.P.E.P. § 608.01(p) (8th ed. 2001); *Oatey*, 514 F.3d at 1276.

Capella's emphasis of the word "on" in description of the Figure does not change the proper construction of "port." (Br. 38; *see also supra*, Section II.A. (citing *Google*, 2017 WL 1149518 at *3-4).) The '217 provisional language cited by Capella demonstrates only that there are multiple types of ports, including circulator ports that can be situated on physical ports:

> The third architecture (Fig. 9) is also bi-directional, but uses only one WSR unit. Circulators are situated on all of the physical input/output ports, allowing for two-way optical propagation. This design has the restriction that at each of the add/drop ports, the add and drop wavelengths must be the same.

Appx04933. Moreover, none of the disclosure for Figure 9 includes manifest words excluding circulator ports from qualifying as "ports." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004); *Teleflex*, 299 F.3d at 1327.

The '217 provisional Figure 9 disclosure also shows Capella's use of more specific language when it intended to refer to specific types of ports. In the provisional application, Capella referred to some of the ports as "physical input/output" ports indicating that the claimed generic ports need not be "physical" ports. Appx04933. Similarly, Capella also used "collimator" as a separate term in

the patent claims. Capella's use of these different terms in the claims contradicts its request to have this Court replace the word "port" with "fiber collimator," because when Capella meant to claim a "collimator," it used that word in the claims. Appx00265-00266(14:48-51); Appx00287-00290(14:6-23, 14:39-45, 14:52-55, 14:62-64, 15:1-3, 15:30-48, 15:58-63, 15:64-67, 16:17-34, 16:52-55, 16:52-17:6, 17:27-52, 18:3-6, 18:26-40); Appx00012-00013; Appx00058-00059; Appx00108-00109; Appx00139-00140; Appx00168-00169; Appx00212-00213. For example, in dependent claim 8 of the '368 patent, Capella claimed a "collimator" as a separate element distinct from the "port" elements of independent claim 1. Appx00265(14:48-51) ("further comprising collimators"); *see also* Appx00012 (citing '368 patent, claims 1 and 8); Appx00108; Appx00168. Capella elected to claim a generic "port" and chose to not claim a specific type of "port." *Liebel–Flarsheim*, 358 F.3d at 906.

Capella's separate use of the different terms is distinguishable from the *PPC Broadband, Inc. v. Corning Optical Communications RF, LLC*, 815 F.3d 747 (Fed. Cir. 2016) case heavily cited by Capella. Here, "ports" and "collimators" are recited as separate claim elements and therefore have different meanings. *Id.*, at 752-53; *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1123 (Fed. Cir. 2004). Unlike in *PPC Broadband*, Capella's proposed construction would result in a disclosed embodiment—Figure 9 of the '217

39

provisional—being read out of all claims. 815 F.3d at 752-53. Further, one of the claim terms at issue in *PPC Broadband* was a preamble term. *Id*. There, the Court determined that the construction canon of different claim terms having different meanings did not apply because one term appeared in the claim preamble and the other appeared in the claim body. *Id*. Here, both "[fiber] collimators" and "ports" appear in the body of the claims and should be construed to give meaning to both terms. *E.g.*, *Applied Med. Resources Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n. 3 (Fed. Cir. 2006).

The broad use of "port" in the claims, not confined to a particular type, is also consistent with industry usage at the time of the invention. Appx05656-05658 (43:16-23, 45:12-13); Appx05909-05920; Appx05948-05959; Appx00012-00013; Appx00058-00059; Appx00108-00109; Appx00139-00140; Appx00168-00169; Appx00212-00213. In its brief, Capella concedes that the term "port" "can have a variety of meanings."[5] (Br. 26.) Capella's expert, Dr. Sergienko, testified that the ordinary and customary meaning of port encompassed circulator ports:

> Q. So under the ordinary and customary meaning, though, circulator ports are one such type of port, correct?

---

[5] Capella's list of non-optics-related meanings of "port" is irrelevant. The claims recite alleged inventions regarding optical devices. Petitioners are not argue that the claimed "port" is "a seaport" or the "left side of a boat" or any of the other unrelated definitions. (Br. 26-27.)

A. The circulator ports are ports with constraints.

Appx05658 (45:12-13); Appx00012; Appx00058; Appx00108; Appx00139; Appx00168; Appx00212.

### 2. Capella Cannot Demonstrate a Clear Disavowal of Claim Scope to Support Its Construction That "Port" Should Be Narrowly Construed

Capella offers only one argument to support deviating from the broadest reasonable interpretation of "port." Capella argues for a finding that the patents disavow a reading of the claims allowing "port" to be read as a circulator, anything connected in any way to a circulator port, or anything other than a fiber collimator. (Br. 26-35) simply because the patent "delineates" circulator ports from "ports." (Br. 26-39). "Delineation" is not a disavowal of claim scope nor a definition. *Thorner v. Sony Computer Entertainment America LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012) (citing *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1335 (Fed. Cir. 2009); *Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1315 (Fed. Cir. 2010)). Criticism of a particular embodiment or prior art is also insufficient to show disclaimer. *Id.*; *e.g.*, *Ventana Medical Systems, Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1181-82 (Fed. Cir. 2006). The Board correctly determined that Capella's contention of discouragement or teaching away from is insufficient, and Capella still fails to identify a clear disavowal of claim scope under the law.

In order to demonstrate a disavowal or definition, the record must include "manifest words of exclusion"—such as disclosing that a requirement applies to "all embodiments" of the claimed invention or that a particular feature is "required." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001) (finding that the patentee limited a particular term by stating that a structure applied to "all embodiments of the present invention contemplated and disclosed herein"); *Innova/Pure Water*, 381 F.3d at 1120-23. There are no such manifest words here.  Notably, both at the Board and in Capella's new cites, Capella fails to identify any statement clearly limiting the definition of "port" to "fiber collimator" or clearly excluding circulator ports. Contrary to Capella's contention, the patents' discussion of prior art references having circulators is insufficient to constitute a disavowal of scope. *E.g.*, *Thorner*, 669 F.3d at 1366-67; *Ventana*, 473 F.3d at 1181-82.  The specification's discussion of a particular circulator use in the prior art does not prohibit using circulators ports as the claimed "ports." *E.g.*, Appx00281-00282(1:59-3:50).  The rest of the specification also does not state that the claimed ports cannot be circulator ports. *E.g.*, Appx00276-00290.  Rather, the circulator port embodiment from the '217 provisional, which is incorporated by reference, shows the opposite because it includes circulator ports.  Appx04933; Appx4945.

Capella's reliance on language from the patent specification discussing certain embodiments of the claimed invention is also misplaced.  (Br. 28-29). Capella's cited language demonstrates only that a fiber collimator can meet the claim term "port," not that a "port" must be a fiber collimator.  For example, Capella cites to portions of the specification that recite a collimator "serving as" a "port."  (Br. 29-30.)  That language demonstrates only that in *some* embodiments "fiber collimators" can serve as "ports."  Examples that can satisfy the claim language do not limit the broadest reasonable interpretation, even if Capella had disclosed only a single embodiment of the claimed "ports," which it did not, as shown by the incorporated-by-reference Figure 9 and its associated description. *Liebel-Flarsheim*, 358 F.3d at 906 (citations omitted).  Statements that collimators "provide" ports (Br. 31-32) also do not meet the "exacting" standard for disavowal of claim scope or require that all ports be fiber collimators.  *Id.*; *see* Section I.A., *supra*.  Similarly, the specification does not have to use "port" and "circulator" interchangeably for a circulator to constitute a port under the broadest reasonable interpretation.  *Thorner*, 669 F.3d at 1366-67.

Capella's reliance on a single sentence in the Summary of the Invention is also insufficient to justify its narrow construction.  (Br. 28.)  Capella cites no authority that such a sentence necessarily limits the broadest reasonable interpretation of the claims when the plain language of the claims is readily

understandable to a skilled artisan. *See Innova/Pure Water*, 381 F.3d at 1121-22 (summarizing a disclosed embodiment does not constitute a clear disavowal). The same Summary section confirms that the patents are not so limited:

> Those skilled in the art will recognize that the aforementioned embodiments provide only two of many embodiments of a dynamically reconfigurable OADM according to the present invention. Various changes, substitutions, and alternations can be made herein, without departing from the principles and the scope of the invention. Accordingly, a skilled artisan can design an OADM in accordance with the present invention, to best suit a given application.

Appx00261(5:41-58); Appx00283(5:41-58). The exemplary nature of the specification's disclosure is reiterated in the Detailed Description section, as well. *E.g.*, Appx00265(13:64-14:3); Appx00287 (13:64-14:3). Capella made clear that its alleged invention is not limited to the disclosed embodiments. Further, limiting the scope of the claims to the Summary is at odds with Capella's characterization of Figure 9 of the '217 provisional as "the present invention." Appx04933. Unlike the cases cited by Capella, limiting the claims to a general description in the Summary would exclude the Figure 9 embodiment that discloses circulator ports as "ports." (Br. 28-29 (citing *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004); *Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1334 (Fed. Cir. 2011); *Sevenson Envtl. Servs., Inc. v. U.S.*, 76 Fed. Cl. 51, 69 (Fed. Cl. 2007)).) Moreover, none of Capella's cases relating to the Summary were decided under the broadest reasonable interpretation standard. (*Id.*)

Capella's expanded discussion of the '217 provisional also does not show a disavowal restricting "ports." Capella mixes-and-matches discussion of different embodiments and prior art in its Brief. (Br. 35-38.) As an initial matter, the provisional's prior art discussion does not void the disclosure of the Figure 9 circulator embodiment, which Capella identified as an embodiment of "the present invention." *See Ventana*, 473 F.3d at 1181-82; Appx04933. And what Capella's Brief characterizes as "describing the invention" is actually a discussion of *certain* exemplary embodiments. (*Cf.* Br. 36 (discussing the Figure 10 embodiment but not all embodiments).) The provisional does not limit Capella's invention to particular embodiments and did not disavow the Figure 9 embodiment. Appx04930-04970. Finally, while Capella argues that "port" and "collimator" are interchangeably used (Br. 36-37), Capella's contention is incorrect. The provisional uses terms like "add/drop ports" when referring to ports with circulators and also refers to "physical input/output ports." Appx04933 (describing Figure 9). At best for Capella, any interchangeable use only indicates that a collimator can be a port—not that all ports are collimators.

In over ten pages of argument, Capella fails to identify any claim language or disclosure that clearly and unmistakably limits the definition of "port" to "a fiber collimator" that is "separate from, coupled to, downstream of, and do not encompass, circulators." There is no such support. Therefore, the Board's

construction of "port" as having its plain meaning is consistent with the record and should be affirmed.

### 3.    Capella Cannot Show that Reversal is Warranted

Capella does not dispute that there is substantial evidence supporting the Board's unpatentability determinations based on the Board's construction of "port." As also discussed in Section I.B., *supra*, substantial evidence supports the Board's conclusions that Bouevitch's microlenses disclose the collimator limitations and Bouevitch's waveguides and circulators disclose the input and output ports based on the Board's port construction for all challenged claims. Appx00022-00023; Appx00111-00112; Appx00174-00175; Appx00070-00072; Appx00142-00143; Appx00217-00218, (citations omitted). If the Board's construction is affirmed, the Board's merits determinations should not be disturbed. Even under Capella's construction of "port," the Board cannot be reversed absent further proceedings. The Board only made determinations in light of its construction and has not considered the art in view of Capella's construction. Further, the Board has not addressed the other record evidence presented by Petitioners in view of Capella's construction, such as Carr's teaching of "optical input fibers 120," "optical output fibers 121," and "imaging lenses 125." Appx01931; Appx07736, Fig. 1B; Appx07747(1:58-67).

### III. The Board's Combination of Bouevitch With Smith, Carr, or Sparks Is Supported by Substantial Evidence and Does Not Destroy Bouevitch's Principle of Operation

The Board properly found substantial reasons to combine the two-axis mirrors of Smith, Carr, or Sparks with the Bouevitch device that used single-axis mirrors. Appx00033-00034; Appx00083-00084; Appx00118; Appx00149; Appx00185; Appx00229-00230. Among other reasons, the Board stated that (1) single-axis and two-axis "mirrors were known to be interchangeable," (2) combining two-axis mirrors with Bouevitch yielded a predictable result, and (3) two-axis mirrors would have been beneficial in providing finer control over attenuation and reducing the potential for crosstalk between ports. Appx00033-00034; Appx00083-00084; Appx00181-00183; Appx00225-00227. Capella does not dispute the Board's rationales for combining the two-axis mirrors of Smith, Carr, or Sparks with Bouevitch.

Instead, Capella contends that the combination of two-axis mirror technology to control power through intentional misalignment with Bouevitch destroys Bouevitch's principle of operation. (Br. 44.) But Capella fundamentally mischaracterizes and unduly limits the plain teachings of Bouevitch. Bouevitch, like the other references, discloses power control based on angular misalignment albeit using single-axis instead of two-axis mirrors. Appx04862(7:35-37). There is no dispute that each of Smith, Carr, and Sparks discloses power control based on

angular misalignment using two-axis mirrors.   Thus, the Board's obviousness combinations are consistent with, and do not destroy, Bouevitch's principle of operation.

### A.    Obviousness Combinations Supported by Substantial Evidence Must Be Upheld

Obviousness is a question of law based on underlying factual findings.   *In re Cuozzo Speed Techs*., LLC, 793 F.3d 1268, 1280 (Fed. Cir. 2015), *aff'd*, *Cuozzo*, 136 S. Ct. 2131.   The scope and content of the prior art and whether a modification would change a reference's principle of operation are questions of fact.   *In re Mouttet*, 686 F.3d 1322, 1330 (Fed. Cir. 2012).   The Court reviews "the Board's factual findings for substantial evidence and review[s] its legal conclusions de novo."   *In re Cuozzo*, 793 F.3d at 1280.

Where "a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result."   *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007).   "The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference."   *In re Keller*, 642 F.2d 413, 425 (CCPA 1981).   Rather, "the test for obviousness is what the combined teachings of the references would have suggested to those having ordinary skill in the art."   *In re Mouttet*, 686 F.3d at

1333. "The prior art's mere disclosure of more than one alternative does not constitute a teaching away from any of these alternatives because such disclosure does not criticize, discredit, or otherwise discourage the solution claimed in the … application." *In re Fulton*, 391 F.3d at 1201.

### B.    Bouevitch's Discloses Power Control Based on the Same Angular Misalignment Technique as the Other References

Capella claims that the combination of two-axis mirror technology to control power through angular misalignment with Bouevitch destroys Bouevitch's principle of operation.   (Br. 42-44.)   But the Board properly recognized that Bouevitch discloses power control based on angular misalignment and thus the obviousness combinations are consistent with, and do not destroy, Bouevitch's principle of operation.  Appx00032; Appx00082; Appx00115-00116; Appx00146-00147; Appx00183-00184; Appx00227-00228.   In particular, Bouevitch expressly states that the "degree of attenuation is based on the degree of deflection provided by the reflector (*i.e.*, the angle of reflection)."  Appx04862(7:35-37).   Bouevitch also discloses an embodiment (Fig. 9) that can use MEMS to selectively misalign the beams for the purposes of power control.  *Id*., 12:35-39, 55-60 (providing variable attenuation (*i.e.*, power control) by selectively reflecting the incident beam "back … at a predetermined angle, generally along a different optical path from which it came" (*i.e.*, by misalignment)).

Capella fails to address these important teachings in its arguments about Bouevitch. The Board correctly found that these passages discloses attenuation by angular misalignment. Appx00115; Appx00146; Appx00183; Appx00227. In some proceedings, Capella argued that Bouevitch concerned interference-based attenuation instead of angular misalignment, but the Board weighed the evidence and properly rejected Capella's argument. Appx00115; Appx00146 ("[H]ad Bouevitch intended to refer to interference-based attenuation instead of angular misalignment, then Bouevitch would have addressed altering distances, not angles of tilt."); *see In re Jolley*, 308 F.3d 1317, 1329 (Fed. Cir. 2002) ("[W]here two different, inconsistent conclusions may reasonably be drawn from the evidence in record, an agency's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence."). Thus, Capella's position is incorrect because the Board found that "Bouevitch discloses embodiments that perform power attenuation by angular misalignment of the beam using MEMS mirrors." Appx00183; Appx00227-00228; *see In re Fulton*, 391 F.3d at 1199 ("The Board's factual findings are upheld unless they are unsupported by substantial evidence.").

This disclosure of attenuation by angular misalignment in Bouevitch is consistent with the understanding of Capella's expert and the use of intentional misalignment to control power in Smith, Carr, and Sparks. Smith, Carr, and

Sparks disclose intentional misalignment of two-axis tilt mirrors to control power. Appx04888-04889; Appx07748; Appx07752; Appx07759-07760. Capella's expert agreed that angular misalignment (*e.g.*, by tilting mirrors) was the only way a person of ordinary skill in the art would have understood the MEMS mirrors of Bouevitch to operate for power control. Appx05758(145:11-25); Appx05897(284:18-25). He agreed that misalignment for power control was a known technique inherent in the disclosure of Bouevitch's tilting MEMS mirrors. Appx08823(104:3-10); Appx05758(145:11-25). He further agreed that Bouevitch's symmetrical 4-*f* optical system, like Smith, Carr, and Sparks, can operate as dynamic gain equalizer by attenuating optical signals to any desired amount with the use of a MEMS mirror array. Appx08815-08816 (96:8-97:19). Thus, Bouevitch uses the same principle of misalignment for power control described in Smith, Carr, and Sparks and the Board's conclusion that a skilled artisan would have reason to combine the MEMs-based devices of Bouevitch with the two-axis mirrors of each of Smith, Carr, and Sparks is supported by substantial evidence. *See In re Fulton*, 391 F.3d at 1199; *In re Mouttet*, 686 F.3d at 1333.

In view of Bouevitch's express disclosure of attenuation based on angles of tilt, Capella has no support for its attempt to limit Bouevitch's principle of operation to a system that minimizes misalignment. Furthermore, Capella's current position that "the express goal of Bouevitch is to minimize or avoid

misalignment" is inconsistent with its previous statement that "Bouevitch's embodiments comprising MEMS do not *necessarily* control power using misalignment." Appx00845; Appx01359. Capella's earlier equivocation on this exact issue illustrates the overstatement of Capella's current position.

Capella's citation to discussions of angular displacement and alignment in Bouevitch also do not support its position. (Br. 45.) For example, Capella quotes an alleged criticism of angular displacement that appears in the background section of Bouevitch. (*Id.*) But Bouevitch was simply mentioning angular displacement in a prior art device, not Bouevitch's invention. Appx04859(1:62-2:7) (discussing U.S. Patent No. 5,414,540). That prior art device concerned an entirely different optical system having an arrangement that, unlike Bouevitch, did not use tilt mirrors at all and was focused only on switching optical signals, not attenuation. Appx05446-05460. Bouevitch never states that angular displacement is undesirable for attenuation and to the contrary, states that attenuation occurs by deflecting a signal off the tilt mirror at an angle (*i.e.*, by angular misalignment). Appx04862(7:35-37).

Other discussions of alignment in Bouevitch are also unavailing for Capella. These passages merely involve efficiencies in the compact arrangement of components in Bouevitch's optical configuration and have nothing to do with other portions of Bouevitch describing a deliberate effort to attenuate an optical signal.

Appx04863-04864(10:65-11:8); Appx04859(2:19-21, 2:37-43). Although Capella emphasizes avoiding misalignment, the Board properly considered and rejected Capella's argument when it found "no inconsistency between Bouevitch's disclosure of methods to prevent *unintentional* misalignment with other methods that incorporate *intentional* misalignment for power control." Appx00116; Appx00147. Accordingly, the Board properly considered the entire teachings of Bouevitch in its combination with Smith, Carr, and Sparks and found Capella's claims to be unpatentable. *See In re Mouttet*, 686 F.3d at 1333.

Capella's reliance on *Plas-Pak Indus., Inc. v. Sulzer Mixpac AG*, 600 F. App'x 755, 757 (Fed. Cir. 2015) is misplaced. There, unlike here, the Board did not find that the claims would have been obvious. 600 F. App'x at 756. On appeal, the Court performed a "limited" substantial evidence review and did not disturb the Board's decision. *Id*. at 757-59. A similarly "limited" review here shows that substantial evidence supports each of the Board's decisions of unpatentability. In addition to its procedural inapplicability, the "principle of operation" analysis in *Plas-Pak* is distinguishable. The *Plas-Pak* Court stated that the primary prior art reference defined its invention as adding stop valves to prevent backflow and reasoned that since the system of valves for preventing backflow was "unique in its implementation," replacing them would have removed "the very system" taught by the reference. *Id*. at 758-59. By contrast here, the use

of single-axis mirrors in Bouevitch is not "unique in its implementation" as Bouevitch discloses reflecting devices with and without MEMS technology. Appx04864(12:35-40).   In fact, substituting two-axis mirrors is consistent with Bouevitch's disclosure of using MEMS tilt mirrors for both switching (in a COADM) and power control (in a DGE).   Appx04865(13:65-14:1); Appx04864 (12:38-39).   Relying on expert testimony, the Board agreed that applying two-axis mirrors was consistent with the teachings of Bouevitch.   Appx00032-00034; Appx00082-00084;  Appx00117-00118;  Appx00148-00149;  Appx00183-00185; Appx00227-00229.

Replacing Bouevitch's single-axis mirrors with two-axis mirrors, is more comparable to *In re Mouttet*, where the Court upheld the substitution of optical crossbar circuitry with electrical crossbar circuitry in a programmable arithmetic processor.   686 F.3d at 1332-33.   There, the Court found that substitution did "not affect the overall principle of operation of a programmable arithmetic processor" since there was nothing "unique to its optical implementation."   *Id*. at 1332. Similarly here, there is nothing unique to the implementation of single-axis mirrors in Bouevitch.   Indeed, the Board found and Capella's expert agreed that a skilled artisan could readily solve the technical considerations of replacing single-axis with two-axis mirrors.   Appx05879-05880(266:16-267:25);   Appx00031; Appx00081; Appx00118; Appx00149; Appx00182; Appx00226.   Using two-axis

mirrors as suggested by Smith, Carr, and Sparks was a simple substitution, *see KSR*, 550 U.S. at 416, and consistent with Bouevitch's disclosure of both attenuation and switching.  Appx04865(13:65-14:1); Appx 04864(12:38-39).

Capella's other case law is unavailing.  For example, Capella cites *In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984) and states that the obviousness finding was reversed "because the combination would prevent the prior art from meeting its stated goal."  (Br. 43, 50.)  But Capella is incorrect because there was no combination at all as the Board only relied upon a single reference.  733 F.2d at 900-01.  *In re Gordon* stands for the unremarkable proposition that the prior art must suggest the desirability of a modification to render the modification obvious.  733 F.2d at 902.  Here, Appellees easily met that standard because the secondary references provided numerous reasons why a skilled artisan would have modified Bouevitch to obtain the benefits of the two-axis mirrors in Smith, Carr, or Sparks.  Appx00033-00034;  Appx00083-00084;  Appx00118;  Appx00149;  Appx00185;  Appx00229-00230.   The Board articulated numerous reasons that support its findings for modifying Bouevitch to have two-axis mirrors.  E.g., Appx00033 ("Smith not only expressly acknowledges this interchangeability, but also identifies benefits to the use of a two-axis mirror: mirror:  in comparison to the two-axis embodiment, single axis systems may be realized using simpler, single axis MEMS arrays but suffer from increased potential for crosstalk between

channels" (internal quotations omitted).); Appx00117 ("[Carr] describ[es] a two-axis MEMS device with highly accurate lateral alignment that permits precise control of the mirrors, a more robust structure, greater packing density, larger mirror sizes, and larger mirror rotation angles than are conventionally obtained and easier electrical connection to the mirrors" (internal quotations omitted).); Appx00182 ("Sparks expressly states that an advantage of the optical switches with two-axis mirrors is that attenuation (*i.e.*, power control) can be achieved without incorporating separate attenuators within the system."). The Board also adequately described the bases for its obviousness determinations by explaining why it credited the testimony of Appellees' experts and why Capella failed to rebut the reasons for the combinations. Appx00033-00034; Appx00083-00084; Appx00117-00118; Appx00148-00149; Appx00184; Appx00228. Finally, Capella's citation to *In re Schweickert*, No. 2016-1266, 2017 WL 371374, at *5 (Fed. Cir. Jan. 26, 2017) (Br. 43) is similarly inapplicable because there, unlike here, the "record lacks support for this supposed motivation to introduce [the secondary reference feature] into [the primary reference device]."[6]

---

[6] Capella's citation to *In re Butler*, No. 98-1555, 1999 WL 164952 (Fed. Cir. Mar. 23, 1999) is improper as this unpublished disposition was not issued after January 1, 2007. Fed. Cir. R. 32.1.

Accordingly, the Board correctly found that substituting single-axis mirrors with two-axis mirrors was consistent with, and does not destroy, Bouevitch's principle of operation and thus substantial evidence supports the Board's obviousness findings.

## IV.    The Board Correctly Determined That Smith Is Prior Art in the Cisco IPRs

This Court issued its opinion in *Dynamic Drinkware, LLC v. National Graphics, Inc.*, 800 F.3d 1375 (Fed. Cir. 2015) on September 4, 2015—after Petitioners in the Cisco IPRs filed their petitions and replies. In *Dynamic Drinkware*, this Court changed the PTO's procedures for demonstrating whether a patent qualifies as 35 U.S.C. § 102(e) prior art if it claims priority to a provisional application under 35 U.S.C. § 119(e). Prior to *Dynamic Drinkware*, the PTO's authority was *Ex parte Yamaguchi* 88 U.S.P.Q.2d 1606 (B.P.A.I. 2008) (precedential), which required an examination of whether the prior art disclosure sufficiently appeared in both the prior art patent and the related provisional. *Dynamic Drinkware* added a second requirement—that the provisional's disclosure provide written description support for claims in the issued prior art patent. 800 F.3d at 1380-81.

Within days of the *Dynamic Drinkware* decision, Cisco sought the Board's permission to submit limited briefing to address the impact of that decision on the

pending Cisco IPRs. Appx00689-00692; Appx01191-01194. Capella had notice and a fair opportunity to rebut and respond to Cisco's *Dynamic Drinkware* briefing. In fact, the Board authorized separate submissions and *both* parties submitted additional briefing in accordance with the Board's orders. Appx00711-00722; Appx01224-01235; Appx00739-00746; Appx01252-01258. At the hearing, Capella argued the prior art status of Smith, which is only relevant to the Cisco IPRs, and addressed Cisco's supplemental briefing. Appx00801-00811; Appx00823-00824. Capella never sought to strike or exclude Cisco's additional briefing and did not seek permission to submit additional evidence or argument beyond its response to Cisco's supplemental briefing. Despite ample opportunity, Capella also did not make any other offer of proof or request any particular procedural remedy. As in the *Belden* case cited by Capella, there was no Board denial of a "concrete, focused" request for procedural relief. *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1079-82 (Fed. Cir. 2015). Thus, like *Belden*, Capella's rights under 5 U.S.C. § 554 were not violated. Capella does not dispute the Board's factual findings that (1) claims 1 and 28 of Smith have adequate § 112 support in the '683 Smith provisional application and (2) the support was carried through from the provisional to the patent. The only issue before this Court is whether Capella had a fair opportunity to be heard as to the prior art status of Smith.

**A.    Capella Had Notice and a Fair Opportunity to Address Smith and Cisco's Supplemental Briefing on *Dynamic Drinkware***

Citing 5 U.S.C. § 554 and the APA, Capella contends that the Board denied it an opportunity to be heard on the issue of whether Smith constituted § 102(e) prior art based on the filing date of the '683 Smith provisional.  But Capella had multiple opportunities to be heard.  *First*, Capella filed a Patent Owner Response ("POR") to the Petition in which Capella offered a rebuttal to the prior art assertion of Smith, and also presented expert testimony on this issue.  Appx00623-00626 (citing to its expert); Appx01137-01139.  *Second*, Capella filed a response to Cisco's supplemental briefing regarding Smith and the '683 Smith provisional following the *Dynamic Drinkware* decision.  Appx00739-00746; Appx01252-01258.  *Third*, Capella had the opportunity to present arguments on the prior art status of Smith and the *Dynamic Drinkware* decision at the oral hearing.  Capella cites no authority finding an APA violation when the party making the claim had an opportunity to respond to an argument—let alone multiple opportunities to respond.

Capella never argued that it lacked an opportunity to respond and never identified with specificity any evidence or arguments that it was unable to present.  Further, Capella did not seek to strike or exclude Cisco's *Dynamic Drinkware* submissions, which were properly based on the Smith provisional and Smith

already in the record, or to submit additional arguments and evidence. Capella did not pursue procedural mechanisms that were available before the Board. In its rehearing requests, Capella did not seek a rehearing on the prior art status of Smith. 37 C.F.R. § 42.71(d)(2). As in *Belden*, Capella's strategic decisions to refrain from seeking permission to make further filings do not give rise to a violation under 5 U.S.C. § 554. *See Belden*, 805 F.3d at 1079-82 ("Belden did not seek to file a surreply, to file additional observations on its cross-examination, to make arguments in those observations, or to have the Board waive any other regulations that it believed prevented it from adequately responding to Mr. Baxter's declaration. With no Board denial of concrete, focused requests before us, we are not prepared to find that Belden was denied a meaningful opportunity to respond to the grounds of rejection.").

Moreover, Capella's claim of no opportunity to respond is directly contradicted by its conduct and arguments below. Capella filed supplemental briefing in response to Cisco's submission that purported to answer the Board's questions on the impact of *Dynamic Drinkware*. Appx00739-00746; Appx01252-01258. Capella was asked to and could have used its supplemental briefing to rebut the Petitioners' written description evidence. Appx00691; Appx01191 ("(3)"). At the hearing, with full knowledge of the carry-through and § 112 claim

support requirements, Capella argued that its POR was sufficient for both elements

under *Dynamic Drinkware*:

> JUDGE TARTAL: Counsel, can I just interrupt you and ask, in the Patent Owner response, was there an argument that Petitioner failed to establish Smith was entitled to the date of its provisional application based on its failure to address whether or not it supports the claims of the Smith patent?
>
> MR. EISENBERG: No, there was not. We focused on the carried-forward prong because we felt it was the strongest argument and they had provided no evidence to the claims that we could rebut because there was no evidence in the record at that time.
>
> JUDGE TARTAL: Do you dispute that you waive the argument by not raising it in the Patent Owner response?
>
> MR. EISENBERG: ***We raised the argument that Smith was not prior art. Even if we may have not expounded on why the claim may not be supported, we clearly made the carried-over argument.*** And if you'd like us to focus on that today, we would be happy to do that.

Appx00804(38:1-17) (emphasis added). The Board invited Capella to address both

of the *Dynamic Drinkware* elements during the hearing, *id*. 38:18-24, and Capella

made extensive arguments in support of its position at the hearing. *Id*. 39:1-45:24,

57:17-24.

Capella's other cited cases also not support its position. The present

situation is not comparable to the circumstances in *Dell Inc. v. Acceleron, LLC*,

818 F.3d 1293, 1301 (Fed. Cir. 2016). In *Dell*, a new argument was raised *during*

the hearing, and the Board dismissed the patent owner's procedural objection at the

hearing. 818 F.3d at 1301. The *SAS Institute, Inc. v. ComplementSoft, LLC* case is even further removed from the facts of this appeal. 825 F.3d 1341, 1349-52 (Fed. Cir. 2016). In *SAS*, the Board changed its claim construction in its final written decision—after all briefing and arguments were concluded—and refused the petitioner's request for rehearing on the new construction. *Id*. Unlike in *Dell* and *SAS*, Capella had notice of Petitioners' argument and the Smith provisional and Smith evidence for months before the hearing and took the opportunity to advance its own arguments both in briefing and at the hearing—without objection. *Cf. id.* The *In re NuVasive* case is also inapposite. 841 F.3d 966 (Fed. Cir. 2016). In *NuVasive*, the petitioner first identified certain prior art disclosures from a reference in its reply. 841 F.3d at 873. The patent owner raised procedural objections before and at the hearing and sought further briefing and argument—all of which were rejected by the Board. *Id*. at 970-73. The *NuVasive* Court found that the Board's refusal to permit the patent owner to file a surreply or to address the matter during oral argument despite its requests did not constitute a sufficient opportunity to rebut the reply evidence. *Id*. In contrast, here Capella had notice of Cisco's *Dynamic Drinkware* supplemental briefing, responded to that briefing, and argued the merits, as well as the impact of the *Dynamic Drinkware* decision at the hearing.

Had Capella needed further opportunity to address Smith or the impact of *Dynamic Drinkware*, Capella should have attempted to use the procedural tools that were available before the Board. In addition, Capella never identified what further information and argument it would have made.[7] Even now, Capella does not specifically identify any additional argument or evidence it would have presented. Accordingly, Capella has failed to demonstrate an APA violation. *See Belden*, 805 F.3d 1064, 1079-82.

### B. The Board Acted Within Its Authority and Properly Allowed the Parties to Address *Dynamic Drinkware* Because the Case Changed PTO Procedures for Determining § 102(e) Prior Art

Capella contends that the Board had no reason to accept supplemental briefing because *Dynamic Drinkware* was not new law. But regardless of whether *Dynamic Drinkware* was new law, Capella does not dispute that the Board properly exercised its authority under 37 C.F.R. § 42.20(d) to order supplemental briefing on any issue in an IPR proceeding in its discretion. The Board was interested in hearing the parties' positions on the impact of *Dynamic Drinkware*, and Capella availed itself of the opportunity provided by the Board. Furthermore, *Dynamic Drinkware* impacted the PTO's procedures in place at the time of the

---

[7] Capella failed to even attempt address Cisco's showing that claim 28 of Smith had adequate § 112 support in the '683 Smith provisional and that the disclosure was carried through from that provisional to the patent. Appx00739-00746; Appx01252-01258; Appx00774(8:4-22).

filing of the petitions and replies for determining whether a patent constitutes a § 102(e) reference based on a priority claim to a provisional application. The Board did not err in allowing the parties to address the *Dynamic Drinkware* decision both before the hearing and at the hearing.

Prior to *Dynamic Drinkware*, the precedential *Yamaguchi* case governed the PTO's determinations of whether a patent claiming priority to a provisional patent application qualifies as prior art under 35 U.S.C. § 102(e). *Yamaguchi*, 88 U.S.P.Q.2d 1606. *Yamaguchi* required only that the disclosure relied on be carried through from the provisional to the patent. *Id*. The *Yamaguchi* test was consistent with the requirements of *In re Klesper* and *In re Lund* for determining whether continuations-in-part are entitled to the priority date of the prior application, which required that subject matter be carried forward.[8] *Klesper*, 397 F.2d 882 (C.C.P.A. 1968); *Lund*, 376 F.2d 982 (C.C.P.A. 1967). The *Yamaguchi* opinion noted that the publication procedures of 35 U.S.C. § 122(b) and 35 U.S.C. § 111(b)'s creation of provisional applications displaced *In re Wertheim*—the case that Capella contends required a § 112 showing before *Dynamic Drinkware*. *Yamaguchi*, 88 U.S.P.Q.2d 1606.

---

[8] Only an *en banc* or Supreme Court decision can overturn precedential authority like *Klesper* and *Lund*. *Deckers Corp. v. U.S.*, 752 F.3d 949, 964 (Fed. Cir. 2014) (citations omitted).

Consistent with the *Yamaguchi* standard previously applied by the PTO, the Cisco IPR petitioners presented evidence in the petitions that the relevant, relied upon disclosure of the '683 Smith provisional reference was carried through to Smith.  Appx00346-00347 (citing Appx05295-05303); Appx00897-00898 (citing Appx05401-05413).  Cisco's expert included a chart detailing the carried-through disclosure.  Appx05295-05303; Appx05401-05413.  Capella does not dispute that Petitioners sought to meet the *Yamaguchi* test.  Moreover, Capella's suggestion that the Cisco IPR petitioners did not make a *prima facie* showing that Smith is § 102(e) art in the petitions (Br. 54) is an improper attempt to seek review of institution decisions.  *See* 35 U.S.C. § 314(d); *Cuozzo*, 136 S. Ct. at 2139-42.

*Dynamic Drinkware* added the requirement to the *Yamaguchi* standard that the disclosure of the provisional provide written description support for claims of the prior art patent.  800 F.3d at 1381-82.  In its supplemental briefing regarding *Dynamic Drinkware*, Capella acknowledged that *Yamaguchi* was in conflict with *Dynamic Drinkware*.  Appx00743(n.4).  For PTO proceedings, including IPRs, the Cisco IPR petitioners applied the correct standard applicable at the time.  The timing of the Cisco IPR petitioners' request to address the new standard from *Dynamic Drinkware* was proper.  The Board properly permitted supplemental briefing and argument on the impact of *Dynamic Drinkware*.  Thus, the Board rendered its final written decision finding that Smith is § 102(e) prior art based on

the complete record before it, including the supplemental briefing and argument both parties provided regarding *Dynamic Drinkware*.    Appx00016-00021; Appx00064-00069.

## CONCLUSION

For the foregoing reasons, Appellees respectfully request that this Court affirm the Board's decisions of unpatentability.

Dated:  May 26, 2017                    Respectfully submitted,

*/s/ Joel D. Sayres*                    */s/ Sarah J. Guske*
Joel D. Sayres                          Sarah J. Guske
Email: joel.sayres@faegrebd.com         Email: sarah.guske@bakerbotts.com
Faegre Baker Daniels LLP                Baker Botts LLP
3200 Wells Fargo Center,                101 California Street, Suite 3070
1700 Lincoln Street                     San Francisco, CA 94111
Denver, CO 80203                        Direct: 415-291-6205
Direct: 303-607-3500

*Attorney for Lumentum Holdings, Inc.,*    *Attorney for Cisco Systems, Inc.*
*Lumentum Inc., Lumentum Operations,*
*LLC.*

*/s/ Nathaniel T. Browand*
Nathaniel T. Browand
Email: nbrowand@milbank.com
Milbank, Tweed, Hadley & McCloy
LLP
28 Liberty Street
New York, NY 10005-1413
Direct: 212-530-5000

*Attorney for Fujitsu Network
Communications, Inc.*

*/s/ Matthew J. Moore*
Matthew J. Moore
Email: matthew.moore@lw.com
Latham & Watkins LLP
555 11th Street NW
Washington, DC 20004
Direct: 202-637-2278

*Attorney for Ciena Corporation*

*/s/ J. Pieter van Es*
J. Pieter van Es
Email: pvanes@bannerwitcoff.com
Banner & Witcoff, Ltd.
Ten South Wacker Drive
Chicago, IL 60606
Direct: 312-463-5000

*Attorney for Coriant Operations,
Inc., and Coriant (USA) Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of May, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States Court of appeals for the Federal Circuit through the Court's CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system

   /s/   Sarah Guske

## CERTIFICATE OF COMPLIANCE

This brief complies with the limitations of Fed. R. App. P.3(a)(7)(B). Excluding those portions exempted by Fed. R. App. P. 3(a)(7)(B)(iii) and Fed. Cir. R. 32(b), it contains 13, 917 words as determined by the automated count routine of Microsoft Word.   This brief also complies with the typeface requirements of Fed. R. App. P. 32 (a)(5) and the type style requirements of Fed. R. App P. 32(a)(6), having been prepared in proportionally spaced typeface in 14 point Times New Roman font.

   /s/   Sarah Guske